[Cite as *State v. Pennington*, 2018-Ohio-3640.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-170199 |
| | | C-170200 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-1501989 |
| | | B-1502543 |
| vs. | : | |
| BRANDON PENNINGTON, | : | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:    Affirmed in C-170200; Appeal Dismissed in
                                C-170199

Date of Judgment Entry on Appeal:  September 12, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

**MYERS, Judge.**

{¶1}    Brandon Pennington appeals his convictions for murder and having weapons while under a disability.  However, he has failed to raise any assignment of error challenging his conviction for having weapons while under a disability, so we dismiss the appeal in the case numbered C-170199.  *See* App.R. 16(A); *see also State v. Harris*, 2017-Ohio-5594, 92 N.E.3d 1283, ¶ 42-43 (1st Dist.).  Finding no merit in his assignments of error relating to the murder conviction, we affirm.

*Events Preceding the Shooting of Ashley Herald*

{¶2}    On the night of April 12, 2017, Ashley Herald invited her friend Donny McKee to Pennington's home in the Price Hill area of Cincinnati, where she had been staying for several days.  McKee, a tattoo artist, inked tattoos on both Herald and Pennington that night and then left in the early hours of the 13th.  Unbeknownst to Pennington, McKee had taken a ring and some video games from Pennington's home.

{¶3}    By about 2:30 a.m. on the 13th, Herald and Pennington figured out that the ring was gone.  In text messages to McKee, Herald accused him of stealing the ring and demanded it back, stating that Pennington was "flipping out" and "sad and Beyond mad about his little [girl's] ring!"

{¶4}    At trial, McKee testified that Herald had given him the ring as collateral because she owed him $20 for the tattoo work.  He said that he took the ring to his girlfriend, who pawned it for him the next day.

{¶5}    McKee believed that Pennington was reading the text messages on Herald's phone. So in his reply text message to Herald, he denied taking the ring and instead accused her of stealing it.

{¶6} At 4:00 a.m., Herald texted her mother for advice because "a tattoo guy" whom she believed to be a friend had just stolen Pennington's ring. According to Herald's text, Pennington was "so mad and kind of cold acting towards me."

{¶7} At 10:30 a.m., Pennington texted McKee to tell him that he did not blame him for the missing ring, and that he just wanted to find it. McKee told Pennington that Herald must have stolen the ring and hidden it in the house. Pennington replied, "Rte now she don't even own the clothes on her back this bitch life mine til she has my shit back." In relation to the missing video games, Pennington texted McKee, "She says wat games but I'll get it out of her just keep me posted if u find them." When McKee complained that Herald was withholding his payment for the tattooing, Pennington replied, "I feel you she fucked a lot shit up."

{¶8} By then, Herald discovered that McKee was lying to Pennington about the ring. She texted McKee, "Why are you trying to make him think this was me you fucking piece of shit."

{¶9} Meanwhile, Herald texted a girlfriend, "I had a tattoo guy come do some work on me and Brandon last night and [he] stole some expensive shit from him and dude is trying to convince Brandon that I did it!! Wtf..this is real fucked up."

{¶10} At about 3:00 p.m., Herald texted McKee, "I'm gonna get the shit beat out of me for this ..real talk.. I'm not even supposed to be texting u right now." Police discovered this text on McKee's phone. The same text, however, had been deleted from Herald's phone, which was recovered by police the night of the shooting.

{¶11} Around 5:00 p.m., Herald texted her friend Thomas Burles to tell him to meet her in Price Hill after he got off of work that night.

{¶12} At 10:00 p.m., Herald texted Burles, "Just call me when ever u get off babe.."

### The Minutes Before Herald Was Shot

{¶13} At 10:37 p.m., Burles texted Herald, "I'm off now, you on. Rosemont?"

{¶14} At 10:42 p.m., Herald texted Burles, "Yes on Rosemont."

{¶15} At 10:43 p.m., Herald texted, "When are you coming?!"

{¶16} At 10:44 p.m., Burles replied, "On my way now baby." And Herald replied, "Ok." That was the last time that Burles heard from Herald.

### After the Shooting

{¶17} At 10:51 p.m., seven minutes after Herald's last text message, Pennington called 911 to report that a female friend had shot herself in the face. Before he mentioned her terrible injury, however, he explained to the dispatcher that the two of them had been "chillin' and whatnot—I guess she was going through stuff that my friend left in the closet, and then I hear a pop, and she shot herself."

{¶18} The dispatcher gave Pennington first-aid instructions and asked some questions. Pennington stated that he had been on the first floor when he heard the gunshot. He found his friend in his second-floor bedroom, and he moved the gun that his friend used to shoot herself to a side table. He said he had no idea that there was a gun in the home.

{¶19} Police arrived at the home minutes later and found Herald in Pennington's bedroom, unconscious, with an obvious gunshot wound to her left cheek. Pennington pointed out where he had placed the gun. An officer testified Pennington's calm and reserved demeanor was remarkable, given that his friend had just shot herself in his home.

{¶20} Shortly after Herald was transported to the hospital, several investigators arrived. Upon entering Pennington's bedroom, they quickly began to doubt Pennington's claim that Herald had shot herself. The gun, a Taurus 9 mm

4

handgun, was recovered from a shelf near the bed. Two bottles of cleaning products were lying on the floor in front of the shelf.

{¶21} Criminalist Patrick Moran testified that, in his 16 years with the police homicide unit, he investigated 60 to 70 suicides and 60 to 70 homicides per year. He said that if the Herald shooting was a suicide as Pennington claimed, then the handgun was "the cleanest gun I've ever seen in a suicide." He explained that in suicide cases:

> A great many times[,] the gun is covered in blood. If it's a close-contact wound, it's my experience that the gun and the barrel are very, very entrusted [sic] with blood and human fluids.
>
> If this gun is dropped by a person that shoots it, it's probably gonna land in their blood. This weapon's very clean.

{¶22} Detective Greg Gehring, who had investigated hundreds of homicides and suicides in the past 15 years, testified that although there was blood and brain matter on Pennington's bed, he immediately noticed how clean the handgun was, for having reportedly been used in a close shooting.

{¶23} Later on, when Gehring went to the hospital to see the still-unconscious Herald, he noted that the gunshot wound to her left cheek was not, in his experience, consistent with a suicide. According to Gehring, gunshot wounds in a suicide are "either usually inner ear, or they're close contact or contact," but Herald's wound was none of those.

{¶24} Meanwhile, at Pennington's home, police found an operable shotgun, a bandolier with shotgun shells, and assorted ammunition for different firearms, including .22-caliber cartridges, 9 mm cartridges, .380-caliber cartridges, and 12-gauge shotgun shells. Pennington was arrested for having weapons while under a disability.

{¶25} During an interview with police, Pennington claimed that he had never seen the handgun used in the shooting, and suggested that a "tattoo guy" may have brought it to his house the night before. He said that after hearing the gunshot, he ran upstairs, grabbed the gun "instantly" and "threw it up there" on the shelf.

{¶26} After Herald's death eight days later, deputy coroner Mona Gretel Case Harlan Stephens, M.D., a forensic pathologist who has conducted more than 5,000 autopsies, conducted an autopsy on Herald's body. Dr. Stephens concluded that, based upon the sparse stippling about three inches from and around the gunshot wound, it was not a contact wound, meaning that the muzzle of the gun was not against Herald's cheek when it fired. She testified that at the time of the injury, the end of the gun barrel was between six inches and two feet away from Herald's face, "too far away for this to be a usual suicide."

{¶27} Dr. Stephens determined that the manner of Herald's death was homicide. She ruled out the possibility of a suicide based upon the appearance of the wound, the appearance of the stippling, and the location of the wound on the cheek, slightly below and to the side of the left eye. She testified that "the location of the wound and the angle would be a very very unusual way for anyone, much less a female, to shoot herself." She testified on cross-examination that she could not, however, completely rule out the possibility of suicide.

{¶28} Police traced the handgun used in Herald's shooting to a purchase made ten years earlier by Alisha Calhoun, Pennington's former girlfriend. According to Calhoun, Pennington had her buy both the handgun and the shotgun for him in 2007. After Calhoun cleared the background check, Pennington gave her the money to buy the guns, and then he kept both of the guns in his Price Hill home.

{¶29} Examination and testing of the handgun revealed that at the time Herald was shot, the shell casing had not ejected properly upon firing, but the gun had fired without malfunction. No usable fingerprints were recovered from the gun.

6

Swabbing of the gun revealed the presence of a mixture of DNA from at least two individuals, but the profile contained insufficient data to be compared with either Herald or Pennington.

{¶30} Pennington was indicted for murder, felony-murder, and having weapons while under a disability. Following a bench trial, the trial court found Pennington guilty on all counts. After merger of the offenses, he was convicted of murder with an accompanying firearm specification and the weapons-under-disability count. He was sentenced to 15 years to life for the murder count, three years for the specification, and 36 months in prison for the weapons-under-disability count. The court ordered that all be served consecutively, for a total of 21 years to life.

### I.    Ineffective Assistance of Counsel

{¶31} In his first assignment of error, Pennington argues that he was denied the effective assistance of counsel. To prevail on an ineffective-assistance claim, an appellant must demonstrate that: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989).

{¶32} In reviewing defense counsel's performance, we must remain highly deferential. *Strickland* at 689. We must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

{¶33} An appellant's demonstration that counsel's performance was deficient does not warrant the reversal of a conviction if counsel's error had no effect on the judgment. *Id.* at 691; *Bradley* at 142. The appellant must affirmatively demonstrate that there is a reasonable probability that, but for counsel's deficient performance,

the result of the trial would have been different. *Strickland* at 693-694; *Bradley* at 143.

{¶34} ***A. Failure to hire a forensic pathology expert.*** Pennington first asserts that defense counsel's performance was deficient because counsel failed to request funds for or hire a forensic pathology expert to contradict the opinion of the state's forensic pathology expert, Dr. Stephens.

{¶35} Generally, the decision whether to call any witness "falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). A decision by defense counsel not to call an expert witness and instead rely on cross-examination of the state's expert is generally a matter of trial strategy and does not constitute ineffective assistance of counsel. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66; *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 118; *State v. McHenry*, 1st Dist. Hamilton No. C-170671, 2018-Ohio-3383, ¶ 25.

{¶36} Here, trial counsel conducted a thorough and rigorous cross-examination of the state's expert, attacking her opinion that the manner of death was homicide, and leading her to concede that there was a chance, albeit slim, that the victim had shot herself. We conclude that defense counsel's decision not to hire or call a forensic pathology expert fell "within the wide range of reasonable professional assistance." *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 244, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶37} Pennington directs us to *Hinton v. Alabama*, 571 U.S. 263, 274-275, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014), where the United States Supreme Court held that trial counsel had rendered deficient performance by employing an expert he knew to be inadequate because he failed to understand the resources that state law made available to him. However, *Hinton* involved a postconviction proceeding

where the defendant produced evidence outside the trial record, including the affidavits of three experts who had reached different conclusions than the state's experts. *See id.* at 270.

{¶38} In this case, on the other hand, Pennington cannot establish prejudice based on the record before us. Resolving this issue in Pennington's favor would be purely speculative. *See State v. Madrigal*, 87 Ohio St.3d 378, 390, 721 N.E.2d 52 (2000). Nothing in the record indicates that testimony from another forensic pathologist would have been favorable to Pennington and would have altered the outcome of the trial. *See id.* at 390-391; *Mundt* at ¶ 118; *State v. Jeffries*, 1st Dist. Hamilton No. C-170182, 2018-Ohio-2160, ¶ 78-79. "Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal." *Madrigal* at 391. Therefore, even assuming that counsel's failure to obtain a forensic pathology expert was deficient, Pennington has failed to demonstrate any resulting prejudice.

{¶39} *B. Failure to discover that the handgun model was defective.* Pennington also argues that counsel should have discovered that the model of handgun that caused Herald's injuries, a Taurus PT111 Millennium, was defective and had been the subject of a Florida class-action lawsuit that alleged defects with the handgun's firing. He asserts that information regarding the defects in the Taurus handguns was "widely publicized," citing a court order that approved a class-action settlement in the Florida case. *See Carter v. Forjas Taurus S.A.*, S.D.Fla. No. 1:13-CV-24583-PAS, 2016 WL 3982489 (July 22, 2016). He acknowledges, however, that the court order in the Florida case was not made part of the record in this case. As we have stated, we are unable to determine on appeal whether ineffective assistance of counsel occurred where the allegations of ineffectiveness are based on facts not appearing in the record. *See State v. Cooperrider*, 4 Ohio St.3d 226, 228, 448

N.E.2d 452 (1983); *State v. Giuggio*, 1st Dist. Hamilton No. C-170133, 2018-Ohio-2376, ¶ 10.

{¶40} *C. Failure to subpoena the victim's mother.* Pennington contends that defense counsel should have subpoenaed Herald's mother to testify at trial because she had made statements that caused the police to investigate the possibility that Herald had previously attempted suicide.

{¶41} We will not second-guess counsel's decision not to call any witness because that is a matter squarely within the ambit of trial strategy. *See Treesh*, 90 Ohio St.3d at 490, 739 N.E.2d 749. It is possible that defense counsel interviewed Herald's mother and decided that her testimony would not be favorable to Pennington. Moreover, although Pennington claims that testimony by Herald's mother may have been favorable to his defense, there is nothing in the record to support that assertion. Therefore, we cannot say that Pennington was prejudiced by counsel's decision not to call Herald's mother as a witness. And we note that defense counsel was able to get into evidence the officer's testimony about a possible prior suicide attempt.

{¶42} *D. Failure to advise a pretrial guilty plea to the weapons-under-disability count.* Finally, Pennington contends that trial counsel should have advised him to enter a guilty plea to the weapons charge prior to trial to prevent the state from introducing into evidence the shotgun, shotgun shells, and certain ammunition that was not compatible with the shotgun or with the handgun that caused Herald's injuries. He claims that the evidence was relevant only to the weapons charge and would not have been admissible at trial if he had entered the plea beforehand.

{¶43} Pennington has not demonstrated that counsel's performance was deficient, or that but for counsel's deficient performance, the result of the bench trial would have been different.

{¶44} *E. Pennington's ineffective-assistance claims fail.* Finding no merit to Pennington's claims that he was denied the effective assistance of counsel, we overrule the first assignment of error.

## II.    Admission of Evidence

{¶45} In his second assignment of error, Pennington argues that the trial court abused its discretion by allowing into evidence certain physical items and testimony. We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 86. We will not disturb on appeal a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice. *State v. Buck*, 2017-Ohio-8242, 100 N.E.3d 118, ¶ 109 (1st Dist.).

{¶46} Because this was a bench trial, we presume that the trial court did not consider improper evidence in reaching its verdict. *See State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 39. Instead, we presume that the court considered only "relevant, material, and competent evidence" unless the record affirmatively discloses otherwise. *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987); *State v. Shears*, 1st Dist. Hamilton No. C-120212, 2013-Ohio-1196, ¶ 25.

{¶47} *A. Evidence related to guns and ammunition.* Pennington argues that the trial court erred by admitting into evidence the shotgun, shotgun shells, and different types of ammunition, and by allowing a detective to testify that Pennington had a tattoo of a bullet on his hand and displayed pictures of shell casings in his home. He contends that the evidence was irrelevant to the murder charges and amounted to improper evidence under Evid.R. 404(B) that was used to portray him as a person with bad character.

{¶48} Pennington failed to object to the evidence and testimony at trial, so he has waived all but plain error. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-

6266, 900 N.E.2d 565, ¶ 70. "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. To prevail on a claim that the trial court committed plain error, an appellant must demonstrate that an error constitutes an obvious defect in the trial proceedings and demonstrate that the error affected the outcome of the trial. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 23.

{¶49} Evid.R. 404(B) precludes admission of evidence of "other crimes, wrongs or acts" to prove a person's character trait to demonstrate conduct in conformity with that trait. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16. But the rule allows trial courts broad discretion to admit evidence of a defendant's other acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See* Evid.R. 404(B); *Williams* at ¶ 17.

{¶50} We question whether the evidence at issue was, in fact, evidence of "other crimes, wrongs, or acts." Nevertheless, we do not find that the trial court plainly erred by admitting it.

{¶51} The shotgun, shotgun shells, and ammunition were relevant to the question of whether Pennington knowingly possessed any firearm, for purposes of the weapons-under-disability charge, so their admission did not contravene Evid.R. 404(B). Therefore, the evidence was properly admitted by the trial court.

{¶52} The detective's testimony about Pennington's bullet tattoo and display of pictures of shell casings came in response to a question about what evidence contradicted Pennington's claim that he did not know there were guns in his home. The detectives had talked to Pennington about those items when they interviewed him. Even though the testimony had little, if any, relevance, it was of such minor

significance that no plain error occurred in its admission. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 73.

{¶53} ***B. Hearsay statements of other pathologists.*** Pennington argues that the trial court abused its discretion by admitting into evidence hearsay statements from forensic pathologists who did not testify at trial. Because he asserts that the admission of the evidence violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution, we review the evidentiary ruling de novo. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶54} Pennington asserts that his confrontation rights were violated by Dr. Stephens's testimony that she had consulted with three other pathologists, all of whom agreed with her that Herald's death was a homicide, and that, prior to that consultation, she had been "99 percent convinced" of her conclusion. However, defense counsel solicited the testimony on cross-examination when he asked Dr. Stephens if it was true that she had told defense counsel, several months prior to trial, that she had consulted other pathologists before arriving at her determination that Herald's death was a homicide. So any error in the admission of the other opinions was invited error. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 75. Under the invited-error doctrine, a party cannot take advantage of an error that the party invited or induced the trial court to make. *State v. Wilks*, Slip Opinion No. 2018-Ohio-1562, ¶ 66. So Pennington's challenge to the testimony on hearsay and confrontation grounds fails. *See State v. Rucker*, 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, ¶ 37.

{¶55} During redirect examination, the state also asked Dr. Stephens a follow-up question about her consultation with other pathologists. But because defense counsel had opened the door to the question, the trial court properly allowed it. *See State v. Smith*, 1st Dist. Hamilton No. C-170028, 2018-Ohio-2504, ¶ 37; *State*

*v. Robertson*, 1st Dist. Hamilton Nos. C-070151 and C-070159, 2008-Ohio-2562, ¶ 20.

{¶56} *C. Hearsay statement of Donny McKee.* During redirect examination, the prosecutor asked McKee if he remembered telling police that, in the morning before she was shot, Herald had called him and told him to bring the stolen items back or Pennington was going to kill her. McKee responded that he did not recall making such a statement.

{¶57} Pennington argues that the trial court erred by allowing the prosecutor to introduce McKee's hearsay statement into evidence through a leading question. He acknowledges that, in responding to the prosecutor's question, McKee did not endorse the statement, but Pennington claims that its introduction was prejudicial because it was the "only suggestion throughout the trial" of his motivation to kill Herald.

{¶58} Pennington did not object to the prosecutor's question, and therefore has forfeited all but plain error. *See* Crim.R. 52(B). Moreover, the question itself was not evidence. *See State v. Sandercock*, 11th Dist. Ashtabula No. 2017-A-0061, 2018-Ohio-2448, ¶ 21; *State v. Siller*, 8th Dist. Cuyahoga No. 90865, 2009-Ohio-2874, ¶ 58. And we presume that "the trial court can distinguish between what a witness actually testifies to and what the state tries to get the witness to say even when defense counsel failed to object." *State v. Alghaben*, 8th Dist. Cuyahoga No. 86044, 2005-Ohio-6490, ¶ 30. Indeed, the trial court had already sustained a defense objection to the same question during the prosecutor's direct examination of McKee. Also, contrary to Pennington's claim, there was ample other evidence in the record revealing Herald's fear that Pennington would harm her. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 210. No plain error occurred.

{¶59} *D. Other-acts evidence.* Pennington argues that the trial court abused its discretion by admitting other-acts testimony about a prior allegation of

domestic violence in violation of Evid.R. 404. In addition, he asserts that the there were "no legitimate reasons to allow the prosecutor to ask about" the prior allegation.

{¶60} Defense counsel asked defense witness Teaionna Richmond over objection if Pennington had ever been violent with her. She responded, "No, never violent, never raised a voice or anything." On cross-examination, the prosecutor asked if she knew whether Pennington had beaten any of his other girlfriends, and she said no. Defense counsel objected when the prosecutor then asked about a domestic-violence complaint issued in 2004 in which a former girlfriend alleged that Pennington had struck her, and asked whether that would change the witness's opinion of Pennington. The trial court overruled the objection, stating that the defense had "opened the door" to the question. Richmond responded, "Not from what I know of him."

{¶61} Pennington asserts that the state improperly introduced evidence of a domestic-violence allegation for which he had not been convicted for the improper purpose of proving that he had acted in conformity with it. He contends that, even if he had been convicted of the 2004 domestic-violence offense, Evid.R. 609 would not have permitted the conviction to be used for impeachment purposes because it was too remote in time, exceeding the rule's ten-year time limit on such evidence.

{¶62} We note that, contrary to Pennington's assertion, no evidence of the prior domestic-violence allegation was admitted. The prosecutor asked the witness about the allegation, but did not introduce evidence related to it. We assume that the court did not consider any such prior allegation. We will, however, consider Pennington's assignment of error as challenging the trial court's allowing of the prosecutor's question.

{¶63} Under Evid.R. 404(A), character evidence is not admissible to prove action in conformity therewith. *State v. Morgan*, 1st Dist. Hamilton No. C-160495, 2017-Ohio-7489, ¶ 9. But under Evid.R. 404(A)(1), "[e]vidence of a personal trait of

15

character offered by an accused, or by the prosecution to rebut the same is admissible." So if a defendant presents evidence of a specific character trait, the door is opened for the prosecution to rebut that evidence. *Id.*

{¶64} For example, if a defendant presents evidence of her or his good character, the defendant opens the door for the state to rebut that claim. And under Evid.R. 405(A), the state may do so by inquiring into relevant specific instances of the defendant's past conduct. *See State v. Collins*, 97 Ohio App.3d 438, 450, 646 N.E.2d 1142 (8th Dist.1994). Evidence of a defendant's prior arrest for a violent offense may be offered to impeach the character witness's testimony that the defendant had a reputation for nonviolence, even if the prior arrest did not result in a conviction. *State v. Sims*, 3 Ohio App.3d 321, 323-324, 445 N.E.2d 235 (8th Dist.1981); *see State v. Hart*, 72 Ohio App.3d 92, 98, 593 N.E.2d 463 (10th Dist.1991), citing *Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

{¶65} Contrary to Pennington's assertion, the ten-year limitation under Evid.R. 609 on the use of a prior conviction for impeachment purposes does not apply if it is being used as a prior specific instance of conduct pursuant to Evid.R. 405. *See Hart* at 99. Under Evid.R. 609, evidence of a prior conviction is admissible in certain circumstances for the purpose of attacking the witness's own credibility, whereas under Evid.R. 405(A), "allowing cross-examination of character witnesses as to their having heard of prior convictions or arrests of a defendant shows whether he has knowledge of defendant's reputation and whether that knowledge influences his opinion in any way." *Id.*, quoting *United States v. Edwards*, 549 F.2d 362, 367 (5th Cir.1977).

{¶66} Here, the defense opened the door to the prosecutor's question about the 2004 domestic-violence complaint when defense counsel asked Richmond if Pennington had ever been violent with her. So the trial court properly allowed cross-

examination about Pennington's prior arrest under Evid.R. 405(A) because it was offered to challenge the character witness's testimony about Pennington's non-violence. *See Sims* at 323-324.

{¶67} *E. Pennington's claims related to the admission of evidence fail.* Because the trial court did not commit error, plain or otherwise, in admitting the challenged evidence, we overrule the second assignment of error.

### III. Prosecutorial Misconduct

{¶68} In his third assignment of error, Pennington argues that the prosecution violated his right to due process by engaging in misconduct. Generally, prosecutorial misconduct will not provide a basis for overturning a conviction unless, on the record as a whole, the misconduct can be said to have deprived the defendant of a fair trial. *See McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 257. The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45.

{¶69} *A. Impeachment during redirect examination.* Pennington asserts that "the state improperly impeached Donny McKee by threatening him with prosecution if he did not testify as they wished." He points to the prosecutor's questions on redirect examination about a conversation that McKee had with prosecutors and a detective a few days before trial. Pennington failed to object, so his challenge to the prosecutor's conduct is reviewed for plain error. *See id.*

{¶70} We conclude that the defense opened the door to the prosecutor's questions when defense counsel asked on cross-examination if McKee had felt threatened by the prosecutors and detective during that conversation. The prosecutor followed up with questions about the conversation, the tenor of which

17

was that McKee had been admonished to tell the truth at trial. We presume that the trial court properly considered McKee's testimony, and conclude that no plain error occurred.

{¶71} Pennington also points again to the prosecutor's question on the redirect examination of McKee about the statement he made to police shortly after Herald's murder about her fear of Pennington. Because he did not object to the question, he cannot predicate error on it unless the trial court's failure to intercede amounted to plain error. *See State v. Jones*, 1st Dist. Hamilton No. C-160826, 2018-Ohio-1130, ¶ 12. As we explained in our resolution of the second assignment of error, the trial court did not commit plain error by permitting the question.

{¶72} *B. Questioning of a defense witness.* Pennington argues that the prosecutor improperly questioned Teaionna Richmond about his 2004 domestic-violence arrest. We conclude that the prosecutor's conduct did not amount to plain error because, as we previously explained, the evidence was admissible after Pennington opened the door with evidence of his nonviolent character.

{¶73} *C. No prosecutorial misconduct occurred.* Because the prosecutor did not act improperly in questioning Richmond, and because no plain error occurred in the prosecutor's questioning of McKee, no misconduct occurred. We overrule the third assignment of error.

### IV. Weight and Sufficiency

{¶74} In his fourth assignment of error, Pennington challenges the weight and sufficiency of the evidence upon which his murder conviction was based. Specifically, he argues that the state failed to prove that he shot Herald.

{¶75} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a

reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering a challenge to the weight of the evidence, the court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶76} Construing the evidence presented at trial in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that Pennington had purposely killed Herald, in violation of R.C. 2903.02(A). After discovering that his ring was taken, Pennington was so angry with Herald that he texted McKee to say that Herald's life was his until he got his ring back. And Herald's text messages to McKee, her mother, and a friend, confirmed how angry Pennington was about it.

{¶77} In addition, Herald's text messages to Burles indicated that she was ready to leave Pennington's home just minutes before she was shot. And in his 911 call, Pennington explained how Herald may have obtained a gun before relaying the crucial information about her being shot. Then he lied to the dispatcher about the handgun and the shotgun, and he lied about the guns during his later interview with police.

{¶78} And despite Pennington's claim to police that after he heard the gunshot and ran to his room, he had "instantly" grabbed the handgun and thrown it on a shelf, two experienced investigators testified that the gun was too clean for Herald to have shot herself. Pennington's calm demeanor immediately after the shooting stood out as unusual to a responding officer. And Dr. Stephens explained her conclusion that the manner of death was homicide.

19

{¶79} Moreover, the trial court, as the trier of fact, was in the best position to judge the credibility of the witnesses. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The court was entitled to reject Pennington's claim to police that he had been downstairs when the shooting occurred.

{¶80} Consequently, we hold that the record contained sufficient evidence to convict Pennington of murder, and his conviction was not against the manifest weight of the evidence. We overrule Pennington's fourth assignment of error.

### *V. Cumulative Error*

{¶81} In his fifth assignment of error, Pennington argues that the cumulative effect of the trial errors deprived him of a fair trial. But since there were not multiple instances of harmless error in the trial, the cumulative-error doctrine does not apply. *See State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.). We overrule the fifth assignment of error.

### *Conclusion*

{¶82} Therefore, we dismiss the appeal in the case numbered C-170199, and we affirm the judgment of the trial court in the appeal numbered C-170200.

Judgment accordingly.

MOCK, P.J., and DETERS, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.