[Cite as *State v. Shepard*, 2021-Ohio-964.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :          APPEAL NO. C-190747
                                                   TRIAL NO. B-1702355
    Plaintiff-Appellee,             :
                                                   *O P I N I O N.*
  vs.                                   :

MARLON SHEPARD,                         :

    Defendant-Appellant.            :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 26, 2021


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**MYERS, Judge.**

{¶1}   Defendant-appellant Marlon Shepard appeals the trial court's judgment convicting him of aggravated murder, felonious assault, aggravated burglary, and two counts of kidnapping, and sentencing him to an aggregate sentence of 36 years to life imprisonment.

{¶2}   In five assignments of error, Shepard argues that the trial court abused its discretion in allowing prejudicial evidence of prior unrelated bad acts to be admitted at trial, that the trial court erred in failing to merge allied offenses of similar import, that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and that he received ineffective assistance from his trial counsel.   Finding no merit to Shepard's arguments, we affirm the trial court's judgment.

### *Factual and Procedural Background*

{¶3}   On July 19, 2013, Brandon Simms, Lateesha Wright, and their young daughter were accosted in their garage by two assailants.   They were held at gunpoint, their home was robbed, and both Simms and Wright were shot.   Simms died from his injuries.

{¶4}   For a lengthy period of time these crimes remained unsolved.   But eventually Shepard and his half-brother Brandon Harris were identified as suspects. For his role in these offenses, Shepard was indicted on May 10, 2017, for aggravated murder, two counts of murder, aggravated robbery, two counts of felonious assault, two counts of kidnapping, and aggravated burglary.   Each count carried an accompanying firearm specification.

{¶5}   Prior to trial, the state filed a notice of intention to use evidence of other robberies committed by Shepard and Harris pursuant to Evid.R. 404(B) and R.C. 2945.59.   It argued that evidence of the other robberies was relevant to establishing Shepard's identity and motive.  Following a hearing, the trial court held that the other-acts evidence was admissible because there was substantial proof that Shepard committed the other acts and because the evidence assisted in establishing Shepard's identity and motive in the present case.

{¶6}   The case was tried to the bench.

### 1.  Testimony Concerning the Charged Offenses

{¶7}   Lateesha Wright testified that on July 19, 2013, she, Simms, and their daughter returned to their home in Woodlawn around 10:00 p.m.  Simms pulled their car into the garage, but before the three could exit from their vehicle, both the driver's door and the front passenger's door were opened from the outside by two assailants.  Simms was startled when the doors were opened.  A shot was fired into the car and the bullet hit Simms.  Although Wright did not realize it at the time, the bullet traveled through Simms and lodged in her shoulder.  Simms later died from his injuries.

{¶8}   The assailants demanded that Simms and Wright hand over their keys, phones, and money.  They took two cell phones from the car, as well as Wright's engagement ring and money from Simms's pocket.  The assailant on Simms's side of the vehicle, who had fired the shot, remained in the garage and held them at gunpoint while the other assailant went into their home.  Wright later heard the gunman tell the second assailant to "go get the car," and she heard what she believed to be a small car pulling up their driveway.  The assailants left, and after waiting a

few seconds, Wright and her daughter ran to a neighbor for help. Wright later discovered that her home was ransacked and that multiple items were taken, including clothing, shoes, purses, jewelry, a video game system, and a television.

{¶9} Wright testified that both assailants were African American. She described the gunman who had shot Simms as "a brown skin black man" and stated that he wore a hooded sweatshirt that was either red and blue or red and black. That gunman had a winter glove on one hand and a clear latex glove on the other. He wore a hood over his head and a white t-shirt tied around his face. Wright explained that the second assailant had darker skin and carried what she characterized as a "hatchet," or a knife with a wooden handle.

{¶10} Woodlawn Assistant Police Chief Don Fourth testified that Woodlawn requested assistance with the investigation of these crimes from the Bureau of Criminal Investigation ("BCI"). While BCI agents handled the bulk of the investigation, Assistant Chief Fourth tracked the stolen cell phones, which were found discarded in locations not far from the crime scene.

{¶11} BCI Special Agent Seth Hagaman assisted Woodlawn police in the investigation, but struggled to develop any leads. In August of 2014, he received a tip from Antonio Gray, an inmate in the Hamilton County Justice Center, who came forward with information on Simms's murder that he claimed he received from Brandon Harris. Agent Hagaman interviewed Gray, and then later fitted him with a recording device on four separate occasions to record conversations with Harris in the Justice Center. He also developed a list of potential suspects, including Shepard, Harris, Renay Johnson, and Ellonzo Martin.

{¶12} Agent Hagaman interviewed Shepard about Simms's murder, but Shepard denied involvement. Shepard did discuss other robberies that Agent Hagaman questioned him about and admitted that he was responsible for selecting the targets of those robberies. Shepard explained the efforts he took to disguise his identity, stating that he would wear long sleeves to cover his tattoos and a white t-shirt over his face.

{¶13} Brandon Harris, Shepard's half-brother, admitted to his role in the murder of Simms and the robbery. He further testified as to Shepard's involvement in the crimes. Harris testified that Shepard selected Simms and Wright's home as their robbery target because he believed it would contain money and drugs. Harris and Shepard received no answer after knocking on the door, so they waited behind the home for the residents to return. A third person—who Harris claimed not to know—served as their driver and waited in a car nearby. When Simms and Wright eventually returned home, Harris and Shepard followed them into the garage. Shepard was armed with a gun, and Harris carried a knife. According to Harris, he wore a dark hooded sweatshirt, while Shepard wore a red hooded sweatshirt. They both wore the hoods over their heads, gloves, and covered their faces with a t-shirt.

{¶14} After the residents pulled into the garage, Shepard opened the driver's door and fired a shot into the vehicle. Harris opened the front passenger's door and obtained keys to the house from Wright's purse. He ransacked the home for drugs and money, but was unable to find either, and ultimately took various other items, including a television and clothing. Harris and Shepard were picked up by their getaway driver, who then dropped Shepard off at Little Caesars.

{¶15} Harris testified that he was arrested for his role in several other robberies, and that while housed in the Hamilton County Justice Center, he confided to fellow inmate Antonio Gray about the offenses in this case. He told Gray that Shepard fired the gun and later discarded that weapon in a river. Harris acknowledged that in return for his testimony against Shepard, he struck a deal to plead to the offense of manslaughter and receive a 20-year prison sentence for his role in these offenses. This sentence would be served concurrently to the sentences he received for his role in several other robberies.

{¶16} Donovan Clark testified that he was housed with Shepard in the Hamilton County Justice Center in both 2015 and 2017. The two talked during recreational time, and Shepard confided in Clark that his brother was trying to "sink him for a murder." Shepard told Clark that he and Harris had been ready to "hit a lick," and that Shepard "upped a pistol" and shot one of the victims after following him into a garage. Shepard wanted Clark's help in "flipping the situation" on Harris.

{¶17} William Wietmarschen, an assistant office manager in the Hamilton County Sheriff's Department, testified that he was responsible for determining where inmates are housed when they are in the Justice Center. Wietmarschen verified that Shepard and Donovan Clark were both jailed in the Justice Center at the same time for a period of time in 2014, 2015, and 2017.

{¶18} Kara Hayes testified that in July of 2013, she was a store manager at Little Caesars in Woodlawn. As part of her duties, she was in charge of other employees' schedules. According to Hayes, she and Shepard were well acquainted; they had previously worked together at a different restaurant and had engaged in a sexual relationship. Hayes promoted Shepard to assistant manager at Little Caesars

and allowed him to clock in and then leave the store at various times without clocking out. Hayes testified that Shepard often wore a red hooded sweatshirt and that when it was particularly hot outside, he would wear a white t-shirt around his head.

{¶19} Hayes recalled that she and Shepard both worked the evening of July 19, 2013. She explained that Shepard had clocked in for work, but later left, claiming he had to take his sick child to an appointment. Hayes was surprised when Shepard returned less than an hour later. After he returned, she saw him showing money to another employee.

### 2. Other-Acts Testimony

{¶20} Pursuant to the court's pretrial ruling, the state offered testimony of prior robberies committed by Harris and Shepard.

{¶21} Colerain Township Sergeant Dustin Weekly testified concerning a robbery that occurred at Pippin Market on August 12, 2013, several weeks after the charged offenses. Shepard admitted to Sergeant Weekly that he, Harris, and Ellonzo Martin had committed the robbery, that he carried a firearm, and that he wore a red hooded sweatshirt. Harris also testified about this robbery, stating that he and Shepard wore hoods over their heads and covered their faces with their shirts during the robbery. Money and a cell phone were taken; the cell phone was later found several miles away from the market.

{¶22} Sergeant Weekly also testified about another robbery of Pippin Market that occurred on October 16, 2013. Shepard again admitted his role in this robbery to Sergeant Weekly, stating that he had not carried a weapon but had pulled his sleeve over his hand to indicate that he had a firearm. Shepard, who wore a dark

7

gray hooded sweatshirt with the hood up, fled the store without obtaining any goods or money after an employee pointed a firearm at him.

{¶23} Cincinnati Police Detective Marcus McNeil testified regarding a robbery that occurred at the Reading Road Drive-Thru on September 7, 2013. Shepard again admitted his involvement in this robbery. He told Detective McNeil that he drove the getaway car while Harris committed the robbery. Harris also testified about this robbery, stating that he entered the store while Shepard and his girlfriend Renay waited in the car, which Harris described as a red Hyundai.

{¶24} Detective McNeil testified about a second robbery of the Reading Road Drive-Thru that occurred on October 14, 2013. During an interview with Detective McNeil, Shepard admitted that he and Harris jumped the counter, forced the clerk into a bathroom, and looked through the register. Shepard wore a red hooded jacket and blue gloves in this robbery; Harris wore a gray hooded sweatshirt. Harris also testified about this robbery. He corroborated Shepard's description of their clothing and stated that they both wore masks.

{¶25} Both Cincinnati Police Detective Brian Wheeler and Harris testified about an aggravated robbery that occurred on September 13, 2013, at the Clifton International Market. Harris stated that he and Shepard committed the robbery and took cash from the market. According to Harris, Shepard wore gloves and a gray hooded sweatshirt, while Harris wore a striped Adidas hooded sweatshirt. Shepard carried a gun and fired two shots into the air during the robbery.

{¶26} Springfield Township Police Detective Jim Stroud testified about an aggravated robbery that took place at the Shamrock gas station on September 13, 2013. Harris also testified about this robbery and admitted that it was committed by

him and Shepard. Harris wore a striped Adidas hooded sweatshirt, Shepard covered his face with a t-shirt, and they both wore gloves.

{¶27} Both Detective Stroud and Harris testified about a robbery of a BP gas station on Vine Street on September 29, 2013. Harris admitted that he and Shepard committed this robbery. Both wore hooded sweatshirts; Shepard's was red and Harris's was gray. They also both wore gloves. Detective Stroud testified that both suspects wore masks and threatened to shoot the clerk.

{¶28} Assistant Police Chief Fourth testified about a robbery of a Little Caesars restaurant in Woodlawn on October 1, 2013. Shepard admitted to Assistant Chief Fourth his involvement in this robbery, stating that he was fired from Little Caesars for stealing money, and that he and Kara Hayes, who was also fired from the restaurant, planned the robbery with Harris. Shepard further stated that Renay was the getaway driver that night. Harris testified that he carried a shotgun and wore a gray hooded sweatshirt, while Shepard wore a red hooded sweatshirt. They both wore masks.

### 3. Verdict and Sentence

{¶29} The trial court found Shepard guilty of all offenses. For purposes of sentencing, it merged the two murder offenses, the aggravated-robbery offense, and one of the felonious-assault offenses with the offense of aggravated murder.

{¶30} Shepard was sentenced to 30 years to life imprisonment for the offense of aggravated murder. The trial court imposed a sentence of eight years for the offense of felonious assault, 11 years for each of the kidnapping offenses, and 11 years for the offense of aggravated burglary. A three-year sentence was imposed for each firearm specification, to be served consecutively to the underlying felony the

specification accompanied. The trial court ordered the sentences for all the underlying felonies to be served concurrently. It further ordered that the sentences imposed for the firearm specifications for both kidnapping offenses and for the offenses of felonious assault and aggravated burglary be served concurrently to each other, but consecutively to the sentence imposed for the firearm specification for the aggravated-murder offense. This resulted in an aggregate sentence of 36 years to life imprisonment.

### *Other-Acts Evidence*

{¶31} In his first assignment of error, Shepard argues that the trial court abused its discretion in allowing evidence of prior bad acts, the other robberies. He contends that the trial court admitted evidence concerning these other crimes in violation of Evid.R. 403 and 404(B).

{¶32} As set forth above, prior to trial the state filed a notice of intention to use evidence of other robberies committed by Shepard and Harris pursuant to Evid.R. 404(B) and R.C. 2945.59. It argued that evidence of the other robberies was relevant to establishing Shepard's identity and motive. Following a hearing, the trial court permitted the state to use the other-acts evidence. The state subsequently presented testimony from multiple officers and Harris concerning eight other robberies that were linked to Shepard and Harris.

{¶33} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." R.C. 2945.59 similarly provides that:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶34} The Supreme Court of Ohio recently set forth a road map for analyzing the admissibility of other-acts evidence under Evid.R. 404(B). The court first recognized the long-standing principle that other-acts evidence may not be used to establish a defendant's propensity to commit crime or to demonstrate that an accused committed the crime in question because of her or his proclivity to commit crime in general. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 21. To be admissible, the other-acts evidence must be "probative of a separate, nonpropensity-based issue." *Id.* at ¶ 22. Whether other-acts evidence is admissible is a question of law that we review de novo. *Id.*

{¶35} The first step in an Evid.R. 404(B) other-acts analysis is to determine whether the evidence is relevant for the particular purpose for which it is being offered. *Id.* at ¶ 26. In other words, it must be relevant to a particular purpose allowed under Evid.R. 404(B). Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evid.R. 401. The evidence must be relevant for a nonpropensity purpose and "must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27.

{¶36} Here, the state contends that the other-acts evidence was relevant to establishing Shepard's identity as the perpetrator of the charged crimes, his modus operandi, and his common scheme or plan.

{¶37} We agree that the other-acts evidence was relevant to establishing Shepard's identity as the perpetrator of the offenses in this case, which was a material issue—if not the only issue—in dispute between the parties. *See Hartman* at ¶ 27. The key question in this case was the identity of the person with Harris the night of the crimes. Wright's testimony established that the crimes were committed by two suspects. Harris admitted committing the crimes and testified that he had acted in concert with Shepard. The material issue in dispute was whether, as Harris testified, Shepard was the second suspect. Where other acts, such as robberies, "[form] a unique, identifiable plan of criminal activity, sufficiently probative as to identity," their admission may be warranted under Evid.R. 404(B). *State v. Jamison*, 49 Ohio St.3d 182, 183, 552 N.E.2d 180 (1990).

{¶38} The evidence adduced at trial established that the charged crimes were committed by two African American assailants, one of whom wore either a red and blue or red and black hooded sweatshirt, a different type of glove on each hand, and a white t-shirt tied around his face. A gun was used during the robbery and a shot was fired. The assailants were picked up by a driver in a small car, and the victims' cell phones were taken during the robbery and discarded nearby.

{¶39} Evidence established that the other robberies were committed close in time to, and shared characteristics in common with, the July 2013 offenses. For example, in all of the other robberies, with the exception of the robbery of Pippin Market on October 16, 2013, Shepard and Harris acted in concert and committed the robberies together. While Harris linked Shepard to all eight of the other robberies, Shepard definitively admitted his involvement in five of the other robberies, specifically both robberies of Pippin Market, both robberies of the Reading Road Drive-Thru, and the robbery of Little Caesars. And like the charged offenses, the robbery of the Reading Road Drive-Thru on September 7 and the robbery of Little Caesars also involved a getaway driver waiting in a car.

{¶40} The other-acts evidence further established that Shepard wore a hooded sweatshirt in six of the other robberies, and, like the offenses in this case, the sweatshirt he wore was red in the October 14 robbery of the Reading Road Drive-Thru and the robberies of the BP gas station and Little Caesars. Shepard covered his face with a t-shirt in the August 12 robbery of Pippin Market and the robbery of the Shamrock gas station. He wore gloves in the October 14 robbery of the Reading Road Drive-Thru and in the robberies of the Shamrock gas station and BP gas station. He wore a mask in the robberies of the BP gas station and Little Caesars and in the October 14 robbery of the Reading Road Drive-Thru.

{¶41} Shepard either brandished or intimated that he carried a weapon in five of the eight other robberies. He actually fired shots during the robbery of the Clifton International Market. And like the July 2013 offenses, Shepard took a cell phone during the August 12 robbery of Pippin Market and discarded it nearby.

13

{¶42} Collectively, the other-acts evidence, if believed, established that Shepard and Harris acted in concert to commit a series of eight robberies in 11 weeks. While committing these robberies, they wore hooded sweatshirts (often red for Shepard), gloves, masks, and t-shirts tied around their faces. They often brandished and/or fired a weapon, had a getaway driver waiting for them, and took cell phones from the victims that were later discarded. It is the collective circumstances and characteristics of these other acts that are relevant towards establishing Shepard's identity as the person who, with Harris, committed the crimes against Simms and Wright.

{¶43} That each robbery did not share all the characteristics of this robbery does not render the other-acts evidence irrelevant or inadmissible under Evid.R. 404(B). In *Jamison*, the Supreme Court of Ohio held that evidence of other robberies was properly admitted under Evid.R. 404(B) to establish the accused's identity. *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180. Appellant argued in *Jamison* that the other-acts evidence was "sufficiently dissimilar" in details to the charged offense, and specifically challenged the admissibility of the other robberies because "a variety of businesses were robbed, [ ] the offenses occurred over several months, and [ ] the robber acted alone or with an accomplice. Sometimes the robber used a firearm; at other times, no gun was observed. Also, the robber escaped on foot or by bicycle." *Id.* at 184. The *Jamison* court rejected that argument, stating that "[a]dmissibility is not adversely affected simply because the other robberies differed in some details." *Id.* at 187.

{¶44} Differences between the other-acts evidence and the charged offense go to the weight of the evidence, rather than its admissibility. *Id.*; *State v. Knight*,

131 Ohio App.3d 349, 353, 722 N.E.2d 568 (1st Dist.1998). Like the *Jamison* court, we conclude that despite the fact that no two robberies were identical, the other-acts evidence was relevant to establishing Shepard's identity. Because the evidence was admissible to show the identity of Shepard as the perpetrator, we need not decide whether it was also admissible to show modus operandi or Shepard's common scheme or plan.

{¶45} We now consider whether the probative value of the evidence was substantially outweighed by its prejudicial effect. *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 29. "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis." *Id.* at ¶ 30. We accordingly review a trial court's determination that the probative value of the other-acts evidence was not substantially outweighed by its prejudicial effect for an abuse of discretion. *Id.* Relevant considerations to such a determination are the extent to which the other-acts evidence is directed to an issue in dispute and whether the state can present the same fact with alternative, less prejudicial, evidence. *Id.* at ¶ 31-32. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." *Id.* at ¶ 31.

{¶46} Here, the other-acts evidence was used to establish Shepard's identity as the perpetrator of the charged crimes, an issue directly in dispute. We are aware of no alternative evidence that could have been used to prove this through less prejudicial means. Consequently, the probative value of the other-acts evidence was high. To be certain, other-acts evidence of eight robberies is prejudicial. But we

15

cannot find that the trial court abused its discretion in determining that the probative value of the other-acts evidence was not substantially outweighed by its prejudicial effect.

{¶47} Further, as this was a bench trial, we presume that the trial court did not rely on evidence for an improper purpose (such as using the prior robberies as evidence that Shepard acted in conformity with his propensity to commit robberies) in reaching a verdict. *State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 46. Rather, "we presume that the court considered only 'relevant, material, and competent evidence' unless the record affirmatively discloses otherwise." *Id.*, quoting *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). Here, the record contains no indication that the trial court considered the other-acts evidence for an improper purpose and we presume that it did not do so.

{¶48} The first assignment of error is overruled.

### *Allied Offenses*

{¶49} In his second assignment of error, Shepard argues that the trial court erred in failing to merge allied offenses of similar import.

{¶50} Under R.C. 2941.25, separate sentences may be imposed on a defendant whose conduct supports multiple offenses if the offenses were dissimilar in import, were committed separately, or were committed with a separate animus. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus; *State v. Pettus*, 1st Dist. Hamilton No. C-170712, 2019-Ohio-2023, ¶ 74.

{¶51} Because Shepard failed to raise a merger argument before the trial court, he has forfeited all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. Such error is only reversible if it affected the

outcome of the proceedings and reversal is necessary to correct a manifest miscarriage of justice. *Id.* Shepard "has the burden to demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus." *Id.*

{**¶52**} Shepard first contends that his conviction for kidnapping Wright must merge with his felonious-assault conviction because Wright was the victim of both offenses and they were not committed separately or with a separate animus. In determining whether kidnapping and another offense are subject to merger, the primary question is "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." *State v. Logan*, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979); *State v. Jackson*, 1st Dist. Hamilton No. C-180341, 2019-Ohio-2027, ¶ 10. "Where the restraint of the victim is prolonged, the confinement of the victim secretive, or the movement of the victim is substantial, there exists a separate animus for each offense." *Jackson* at ¶ 10.

{**¶53**} Here, the offense of felonious assault occurred immediately; Shepard shot Simms as soon as he opened the car door, and the bullet traveled through Simms and struck Wright. The kidnapping occurred when Shepard held Wright at gunpoint while Harris ransacked her house. The restraint of Wright was prolonged, it was done for the purpose of confining her while Harris burglarized her home, and it was not merely incidental to the felonious assault. We accordingly find that each of these offenses was committed with a separate animus.

{**¶54**} Shepard additionally argues that his conviction for kidnapping Wright should merge with his aggravated-robbery conviction. But Shepard was not

convicted of aggravated robbery, as the trial court merged the offense of aggravated robbery into the offense of aggravated murder, and no sentence was imposed for that offense.

{¶55} Shepard next argues that his conviction for aggravated burglary should have merged with his conviction for aggravated murder. We disagree. The offense of aggravated burglary was complete when Shepard entered the garage with the intent to steal drugs and money. *See State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 129 (the offense of aggravated burglary was complete when the defendant entered the residence with the intent to commit murder, theft, or kidnapping). The aggravated murder was separately committed when he purposely opened the door of Simms's vehicle and shot Simms. Because these offenses were committed separately, they were not subject to merger.

{¶56} Shepard last contends that the trial court erred in imposing sentence on multiple firearm specifications. The trial court imposed a sentence of three years for each accompanying firearm specification. It ordered that the sentences on the firearm specifications imposed for the offenses of felonious assault, kidnapping, and aggravated burglary be served concurrently to each other, but consecutively to the sentence imposed for the firearm specification for aggravated murder, for a total of six years on the specifications.

{¶57} We find Shepard's argument to be without merit, as R.C. 2929.14(B)(1)(g) permitted the imposition of sentences for all firearm specifications in this case. This statute provides that:

> If an offender is convicted of or pleads guilty to two or more felonies, if
>
> one or more of those felonies are aggravated murder, murder,

attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

R.C. 2929.14(B)(1)(g). As Shepard was convicted of at least one of the specified felony offenses, the trial court was required to impose sentence on the two most serious specifications, and was permitted to impose sentence on all specifications.

{¶58} The trial court properly sentenced Shepard on each offense. The second assignment of error is accordingly overruled.

### Sufficiency and Weight

{¶59} In his third and fourth assignments of error, Shepard challenges the sufficiency and the weight of the evidence supporting his convictions.

{¶60} In a challenge to the sufficiency of the evidence, the question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when considering a challenge to the weight of the evidence, the court must examine the entire record, weigh the

evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the court clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶61} Shepard argues that the state failed to establish his identity as the perpetrator of the charged offenses. On this point, Harris testified that he and Shepard committed the offenses against Simms, Wright, and their daughter. He testified that Shepard carried a gun and shot Simms, and that he (Harris) searched the house for drugs and money. Donovan Clark testified that Shepard confided to him while they were incarcerated together in the Justice Center that he "upped a pistol" and shot a victim whom he followed into a garage when attempting to "hit a lick." Kara Hayes's testimony supported the testimony that Shepard committed these crimes. Hayes testified that on the evening that these offenses were committed, Shepard clocked in for work but later left, claiming he had to take his sick child to an appointment. Shepard returned less than an hour later, and Hayes saw him showing money to another employee. In addition, the other-acts evidence established Shepard's identity as the perpetrator of the offenses. Viewed in the light most favorable to the prosecution, this evidence was sufficient to establish that Shepard had committed the charged offenses. *See Jenks* at paragraph two of the syllabus.

{¶62} We further find that Shepard's convictions were not against the manifest weight of the evidence. Defense counsel thoroughly cross-examined Harris and Clark on their motivations for testifying and the veracity of their statements. The trial court was in the best position to judge the credibility of each of the

witnesses, and it was entitled to believe some, all, or none of their testimony. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Williams*, 1st Dist. Hamilton No. C-180574, 2020-Ohio-1367, ¶ 36. Corroborating Harris's testimony that Shepard had committed these crimes was the testimony of Hayes, as well as the other-acts evidence establishing Shepard's identity as the perpetrator.

**{¶63}** Shepard's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. The third and fourth assignments of error are accordingly overruled.

### *Ineffective Assistance*

**{¶64}** In his fifth assignment of error, Shepard argues that he received ineffective assistance from his trial counsel.

**{¶65}** Counsel will not be considered ineffective unless her or his performance was deficient and caused actual prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 688; *Bradley* at 142. A defendant is only prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the deficient performance. *Strickland* at 694; *Bradley* at 142.

**{¶66}** Shepard specifically argues that his counsel was ineffective for failing to engage an expert to testify regarding the unreliability of the state's cooperating witnesses. But this court has consistently held that whether to call an expert witness

21

is a matter of trial strategy, and that the failure to present expert testimony does not constitute ineffective assistance. *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 74.

{¶67} Defense counsel thoroughly cross-examined the cooperating witnesses on their motivations for testifying and any "deals" they may have received. We cannot say that the outcome of the proceedings would have been different but for counsel's failure to call an expert witness. The fifth assignment of error is overruled.

### *Conclusion*

{¶68} Having found no merit to Shepard's assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.**, and **CROUSE, J.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.