[Cite as *State v. Davis*, 2022-Ohio-2797.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-210538 |
| | | C-210539 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-2002302A |
| | | B-2004898 |
| vs. | : | |
| | | *O P I N I O N.* |
| GEORGE DAVIS, | : | |
| Defendant-Appellant. | : | |


Criminal Appeals From:   Hamilton County Court of Common Pleas

Judgments Appealed From Are:   Affirmed and Remanded in C-210539; Appeal
Dismissed in C-210538

Date of Judgment Entry on Appeal: August 12, 2022


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela J. Glaser*, for Defendant-Appellant.

**MYERS, Presiding Judge.**

{¶1}    In the appeal numbered C-210539, defendant-appellant George Davis appeals from the trial court's judgment convicting him, following a bench trial, of felony murder, an accompanying firearm specification, aggravated robbery, and having a weapon while under a disability.

{¶2}    In two assignments of error, Davis argues that the trial court erred in imposing sentences on both the offenses of felony murder and aggravated robbery because they are allied offenses subject to merger, and that his convictions for felony murder and aggravated robbery were not supported by the weight or the sufficiency of the evidence.  We find no merit to Davis's arguments and we affirm the trial court's judgment.  But because the sentencing entry omitted the trial court's order that the offenses of felony murder and aggravated robbery were to be served consecutively, we remand for the trial court to correct the clerical error in its sentencing entry.

{¶3}    In the appeal numbered C-210538, Davis appeals from the trial court's judgment convicting him of two counts of promoting prostitution.  But because Davis has advanced no assignments of error with respect to those convictions, we dismiss the appeal.

*Factual and Procedural Background*

{¶4}    In the case numbered B-2004898, Davis was indicted for murder, felony murder, felonious assault, aggravated robbery, and having a weapon while under a disability for his role in the death of Mohamed Ndiaye.  With the exception of the offense of having a weapon while under a disability, all charged offenses carried two accompanying firearm specifications.  In the case numbered B-2002302A, Davis was indicted for two counts of promoting prostitution.

2

{¶5} The cases were tried together in a bench trial, where testimony established that officers were dispatched to 302 South Wayne Avenue in Lockland for reports of a shooting at approximately 2:30 a.m. on May 10, 2020. The responding officers found Ndiaye lying face down on his driveway. He had suffered gunshot wounds to his torso, left arm, and right thigh. Ndiaye was unresponsive at the time the officers arrived, and he died shortly thereafter. Neighbors who had gathered outside told the officers that two suspects had fled from the scene and were seen leaving in a vehicle described as a dark-colored Dodge Dart.

{¶6} The state presented testimony from Davis's codefendant Donna Sparks. Sparks explained that she had known Davis since 2016, and she described their relationship as "friends with benefits," stating that they "would get high, have sex, hang out." Sparks told the court that she engaged in prostitution to obtain money for drugs, and that Davis often accompanied her when she met with "johns." He would wait in the car and was there to protect her if something went wrong. Sparks testified that one of her clients in her prostitution business rented a Dodge Charger for her to drive. She often let Davis drive the car as well.

{¶7} Sparks testified that she met Ndiaye on May 9, 2020, at a liquor store on Reading Road. After they introduced themselves, Ndiaye told Sparks that he was "looking for a girl to have some fun." Sparks expressed interest, and the two exchanged numbers. Sparks went to Ndiaye's house later that night, where they did drugs, partied, and engaged in sex. Ndiaye paid Sparks for her services with drugs. After Sparks and Ndiaye were finished, Davis drove Sparks back to the Gateway Motel on Reading Road, where she was staying at the time.

{¶8} At the motel, Sparks learned that Davis was "plotting on" Ndiaye, and that he intended to rob Ndiaye later that night. Sparks testified that Davis instructed her to text Ndiaye that she was coming back over. According to Sparks, her role was to get Ndiaye outside so that Davis could rob him. Both Sparks and Davis changed into black clothing, and they picked up a third person named Eric on their way to Ndiaye's to help with the robbery.

{¶9} Sparks testified that after being dropped off at Ndiaye's, she lured him outside by asking him if he wanted to smoke a cigarette. Once Sparks and Ndiaye were outside on the porch, Davis ran up with a gun and demanded money from Ndiaye. Ndiaye reached for his own weapon, and Davis fired at him. After being shot, Ndiaye fell off the porch and landed in the driveway. Eric, the intended third participant in the robbery, got scared and ran off after Davis fired at Ndiaye. Sparks and Davis ran into Ndiaye's house, where they stole drugs and a gun. While inside the home, Davis shot one of Ndiaye's dogs. Sparks and Davis ran from the home to their car, where they fled from the scene.

{¶10} According to Sparks, she and Davis then went to the home of Davis's friend George, and Davis instructed Sparks to call her drug dealer, Tip, because he and George intended to rob Tip. The two men hid in the trunk of the Dodge Charger, preparing to jump out and rob Tip when he arrived. But Sparks testified that when Tip pulled up, she jumped in his car, warned him about the planned robbery, and the two of them drove off, leaving Davis and George in the trunk.

{¶11} During Sparks's testimony, the state played video surveillance from the Gateway Motel from the night of Ndiaye's murder. As Sparks watched the video, she identified clips of her and Davis coming and going from the motel in a pattern that

matched the testimony that Sparks had provided about their actions the evening of the murder. Sparks first identified the two arriving at the motel at approximately 12:45 a.m. on May 10, 2020, after leaving Ndiaye's home for the first time. She then identified them leaving the motel a little over an hour later to go back to Ndiaye's. She last identified Davis returning to the motel by himself at 5:12 a.m. in the Dodge Charger, and herself being dropped off at the motel in a different car at 5:32 a.m.

**{¶12}** Sparks testified that she was indicted for murder and aggravated robbery for her role in Ndiaye's death. She stated that the prosecutor had made no specific promises to her, but that if she testified truthfully in Davis's trial, the prosecutor would let the judge know that she had done so and recommend some type of case consideration. She also acknowledged that in the first statement she gave to the police, which was given prior to an indictment being issued against her, she did not identify Davis as having participated in the crimes.

**{¶13}** The state also presented testimony from Justine Porter and David Allen, who lived together in a building down the street from Ndiaye's home. Both Porter and Allen heard gunshots around 2:30 a.m. on May 10, 2020. After hearing the shots, they looked out their window and saw two figures running across the street and behind an apartment complex. Within seconds of the figures running behind the building, they saw a car pull out from behind the apartment complex and drive away. Porter testified that she told officers that the car looked like either a Dodge Dart or a Dodge Charger.

**{¶14}** Michael Gardner testified that he met Sparks online and hired her to have sex for money. Gardner met Davis through Sparks, and the three "hung out" together frequently in April and May of 2020. Gardner testified that he helped Sparks pay for her motel room and that he rented her a Dodge Charger.

{¶15} Kasi Powell, an intelligence analyst for the Hamilton County Sheriff's Department, testified that she retrieved information from the cell phones of Davis, Sparks, and Ndiaye. She identified text messages between Ndiaye and Sparks that she retrieved from Ndiaye's phone. Powell testified that the messages showed that Ndiaye and Sparks first began communicating around 6:20 p.m. on May 9, 2020. At approximately 12:45 a.m. on May 10, 2020, Ndiaye texted Sparks to ask if she was sure that she was coming back over. Sparks responded affirmatively, and Ndiaye asked how long it would be until she arrived. The two continued to text back and forth about when Sparks would get there.

{¶16} Powell additionally testified about the information that she retrieved from Davis's phone, which included multiple internet searches about a Lockland homicide. And she testified that she retrieved information regarding cell-phone tower pings, which she explained by stating "on your physical device, when you go to make a phone call, they create a thing called radio frequency, which connects to the closest tower or a tower that is available." She further explained that a record is kept on the phone placing the outgoing call of which cell-phone tower the phone "pings" off. Davis's phone pinged off a tower near the Gateway Motel at 1:59 a.m. on the day of Ndiaye's murder. At approximately 2:13 a.m., his phone pinged off a tower near Ndiaye's home. The phone continued to ping off a tower near Ndiaye's home at 2:38 a.m. Powell identified on a map the area containing the tower off which the phone pinged. She also identified Davis's home on the map and testified that it was located very near to Ndiaye's home.

{¶17} Davis testified on his own behalf. He corroborated Sparks's testimony that the two were "friends with benefits" and that he assisted her in her prostitution

business for her safety. Davis stated that he met Ndiaye in either 2007 or 2008, when he and his mother had lived in a home behind Ndiaye. He and Ndiaye became friends, and he would often provide escorts for Ndiaye. On May 9, 2020, Davis ran into Ndiaye at a liquor store, and Ndiaye told Davis that he was looking for a date for that night. Davis directed Ndiaye to Sparks, who was outside in the parking lot. Davis subsequently dropped Sparks off at Ndiaye's home that evening and then later picked her up when she texted him to do so. Davis testified that after leaving Ndiaye's, he and Sparks returned to the Gateway Motel and smoked crack. He denied planning to rob Ndiaye, stating that he would not want to rob a good client.

{¶18} Davis testified that he and Sparks left the Gateway Motel together. He went to his mother's home, where he "hung out" with his nephew Eliah Smith. According to Davis, Sparks went back to Ndiaye's after dropping Davis off. Sparks returned later to pick up Davis. Her ex-boyfriend Tip was with her. Davis testified that Tip was shaken up, distraught, in pain, and bleeding. Tip and Sparks told Davis that Tip had shown up at Ndiaye's, tussled with him, and was shot. According to Davis, Tip and Sparks had a ride waiting for them in Carthage. They went with the other ride, and Davis took the car to his drug dealer's house, where he did more drugs before returning to the Gateway Motel.

{¶19} Davis also presented testimony from his nephew, Eliah Smith. Smith stated that he had been playing video games at his grandmother's house on the evening of May 9, 2020, going into the early hours of May 10, 2020. He testified that he saw Davis around 2:00 a.m. that morning, stating "I remember he was just being normal, for real. He was just chillin' in the room." On cross-examination, Smith was confused as to whether he had seen Davis on a Friday night into a Saturday morning, or on a

Saturday night into a Sunday morning (May 10, 2020, the day on which Ndiaye was shot, was a Sunday).

{¶20} After the trial was concluded, the trial court acquitted Davis of the first count of murder in violation of R.C. 2903.02(A), which alleged that he had purposely killed Ndiaye. It found him guilty of the remaining offenses, which included felony murder in violation of R.C. 2903.02(B) (where the underlying felony was felonious assault), felonious assault in violation of R.C. 2903.11(A)(2), aggravated robbery in violation of R.C. 2911.01(A)(1), and having a weapon while under a disability in violation of R.C. 2929.13(A)(2). Davis was also found guilty of the firearm specifications accompanying these offenses. And he was found guilty of both counts of promoting prostitution.

{¶21} The trial court sentenced Davis to 15 years to life on the felony-murder count, along with a consecutive three years for the mandatory firearm specification (merging it with the one-year specification). The court merged the felonious-assault count with the murder count. With respect to the aggravated-robbery count, the trial court imposed a sentence of seven years, which it ordered to be served consecutively to the sentence imposed for murder. The trial court further imposed a sentence of 36 months for having a weapon while under a disability, to be served concurrently with the other sentences that had been imposed.

{¶22} The two counts of promoting prostitution were merged at sentencing, and the trial court imposed a sentence of 12 months, to be served concurrently with the sentence imposed in the case numbered B-2004898. This resulted in an aggregate sentence of 25 years to life.

8

### *Allied Offenses*

**{¶23}** In his first assignment of error, Davis argues that the trial court erred in imposing consecutive sentences for the offenses of murder and aggravated robbery because they are allied offenses.

**{¶24}** Prior to sentencing, Davis submitted a sentencing memorandum to the court. In it, Davis argued that the offenses of murder and felonious assault were allied offenses of similar import subject to merger because felonious assault was the underlying predicate offense for the felony-murder offense. With respect to the offenses of murder and aggravated robbery, Davis argued that the offenses were part of the same continuing course of conduct and that the sentences imposed on those counts should be served concurrently. He did not argue that they were allied offenses subject to merger. At the sentencing hearing, Davis argued in accordance with the sentencing memorandum and asked the trial court to impose concurrent sentences for the offenses of murder and aggravated robbery. The state agreed that the murder and felonious-assault charges should merge.

**{¶25}** Because Davis failed to raise at sentencing the issue of whether the offenses of felony murder and aggravated robbery were allied offenses, we review for plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3; *State v. Cook*, 1st Dist. Hamilton Nos. C-210142, C-210143 and C-210144, 2021-Ohio-3841, ¶ 33. Plain error is only reversible if "it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *Rogers* at ¶ 3; *Cook* at ¶ 33.

**{¶26}** Under R.C. 2941.25, a trial court may impose separate sentences on a defendant whose conduct supports multiple offenses if the offenses were dissimilar in

import, were committed separately, or were committed with a separate animus. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus; *State v. Pettus*, 1st Dist. Hamilton No. C-170712, 2019-Ohio-2023, ¶ 74.

**{¶27}** Davis was convicted of felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The underlying offense of violence in this case was felonious assault. Davis was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides that:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

**{¶28}** The evidence presented at trial established that Davis ran up to Ndiaye, demanded money, and then shot Ndiaye when he saw Ndiaye reach for his own weapon. Davis and Sparks then entered Ndiaye's home and took drugs and a firearm. On these facts, we find that the offenses of felony murder and aggravated robbery were not allied offenses because they were committed with a separate animus.

**{¶29}** Animus refers to a defendant's "purpose or, more properly, immediate motive." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979); *State v. Merz*, 1st Dist. Hamilton No. C-200152, 2021-Ohio-2093, ¶ 10. A defendant's animus

may be inferred from the surrounding circumstances. *State v. Parham*, 2019-Ohio-358, 121 N.E.3d 412, ¶ 78 (10th Dist.).

{¶30} Here, the offense of aggravated robbery was completed when Davis pointed a weapon at Ndiaye and demanded money. Davis's act of shooting Ndiaye three times involved an act of force that was well in excess of that needed to commit the robbery, demonstrating an animus to kill separate from the animus to commit robbery. *See Parham* at ¶ 80-81 (where defendant pointed a gun at victim, demanded his belongings, beat victim until victim was unconscious, and then continued to beat victim, the trial court could infer that defendant's motivation changed during the course of the crime from robbery to causing life-threatening injury).

{¶31} On this record, we find no plain error in the trial court's imposition of separate sentences for the offenses of felony murder and aggravated robbery.

{¶32} While the trial court did not err in imposing separate sentences, its sentencing entry contains a clerical error with respect to these offenses. At the sentencing hearing, the trial court ordered that the sentences for felony murder and aggravated robbery be served consecutively. And it made the necessary findings to support the imposition of consecutive sentences. But the trial court failed to include in the sentencing entry the language ordering that the sentences were to be served consecutively. The case must be remanded for the trial court to correct this clerical error.

{¶33} Davis's first assignment of error is overruled.

*Sufficiency and Weight of the Evidence*

**{¶34}** In his second assignment of error, Davis argues that his convictions for felony murder and aggravated robbery were not supported by sufficient evidence and were against the manifest weight of the evidence.

**{¶35}** When reviewing the sufficiency of the evidence, we must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶36}** As set forth above, Davis was convicted of felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Felonious assault was the charged underlying offense of violence in this case. He was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which prohibits having a deadly weapon on the offender's person or under the offender's control and either displaying, brandishing, or indicating possession of the weapon while committing or attempting to commit a theft offense.

**{¶37}** Sparks testified that Davis plotted to rob Ndiaye and that she lured Ndiaye outside of his apartment so that Davis could do so. She testified that Davis approached Ndiaye with a firearm, demanded Ndiaye's money, and then shot Ndiaye after Ndiaye reached for his own weapon. Viewed in the light most favorable to the prosecution, Sparks's testimony, if believed, was sufficient to establish the elements of felony murder and aggravated robbery beyond a reasonable doubt. *See Walker* at ¶ 12. Davis's convictions were supported by sufficient evidence.

**{¶38}** We further find that Davis's convictions were not against the manifest weight of the evidence. The trial court, as the trier of fact, was in the best position to judge the credibility of the witnesses. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Shepard*, 1st Dist. Hamilton No. C-190747, 2021-Ohio-964, ¶ 62. It was entitled to find Sparks's testimony credible, and to reject Davis's version of events as incredible and self-serving. In fact, the trial court stated that it found Davis's account that a third person was the shooter who accompanied Sparks to be not credible and to lack corroboration. The trial court additionally specified that it found the alibi testimony offered by Davis's nephew Smith to lack credibility.

**{¶39}** This was not the rare case in which the trier of fact lost its way and committed a manifest miscarriage of justice in convicting Davis. The second assignment of error is overruled.

### *Conclusion*

**{¶40}** The appeal numbered C-210538 is dismissed. The trial court's judgment is affirmed in the appeal numbered C-210539, and the case is remanded for the trial court to correct the clerical error in its sentencing entry.

Judgment accordingly.


**ZAYAS** and **WINKLER, JJ.,** concur.


Please note:

The court has recorded its own entry on the date of the release of this opinion.