[Cite as *State v. Henderson*, 2024-Ohio-2312.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230527 |
| | | TRIAL NO. C-23CRB-5851 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ANTHONY HENDERSON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Reversed And Appellant Discharged

Date of Judgment Entry on Appeal: June 18, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**Воск, Presiding Judge.**

**{¶1}** When the owner of a mall jewelry kiosk swiped defendant-appellant Anthony Henderson's credit card, Henderson, the would-be-purchaser of jewelry, received a phone notification that the transaction was complete. The kiosk owner, however, saw "Declined" on his credit card reader. The parties consulted with a police officer who suggested that Henderson leave with the jewelry and return to pay the purchase price if he learned the transaction did not go through. The owner agreed and Henderson left with the jewelry. When the owner later determined that he had not been paid, the police officer arrested Henderson for theft.

**{¶2}** After a bench trial, the trial court convicted Henderson. On appeal, Henderson asserts, among other arguments, that his conviction was based on insufficient evidence. Because the kiosk owner voluntarily allowed Henderson to leave the store with the jewelry, the state presented insufficient evidence that Henderson obtained control over the jewelry without the owner's consent. We reverse Henderson's conviction and discharge him from further prosecution.

## I. Facts and Procedure

### A. The evidence at trial

**{¶3}** On Sunday, March 26, 2023, Henderson visited the Jewelry Palace kiosk in Northgate Mall and selected a necklace and pendant for his girlfriend. He and the kiosk owner negotiated the price and eventually settled on $140 for the two pieces. When the owner swiped Henderson's credit card, Henderson received a phone notification stating, "140.00 at Jewelry Palace. You now have $3.45 available to spend on Credit Builder."

**{¶4}** The kiosk owner's credit card reader, however, said the transaction was declined. When the owner swiped Henderson's card again, Henderson was notified, "Your Credit Builder was declined for $140.00 at Jewelry Palace because your balance is $3.45." Again, the card reader stated that the transaction was declined. The owner told Henderson he would need to pay some other way. Henderson insisted that he had paid and showed the owner the notifications.

**{¶5}** The two argued until the owner called over Officer Patrick Quinn, who was working a detail in the mall. Both Henderson and the owner gave their sides of the story to Quinn, who viewed both the declined notifications from the owner and the notifications on Henderson's phone. Quinn proposed a compromise: Henderson would take the jewelry and return to pay the $140 if Henderson later learned that the transaction did not go through. While the owner believed Henderson had not paid for the jewelry, he agreed to allow Henderson to leave with the jewelry. Henderson gave the owner his name and address before leaving.

**{¶6}** At the end of the day, the owner checked whether the sale came through. His "Totals Report" dated March 26, 2023, showed $21.56. He testified that the transaction never came through on his end. Later, the owner told Quinn that he was never paid, and Quinn filed a complaint for theft against Henderson.

**{¶7}** The state produced Jewelry Palace's business checking statement for March 2023. This statement showed no transactions on the Sunday that Henderson visited the kiosk. Indeed, despite the owner's representation that the store was open seven days per week, the March 2023 statement contained no weekend transactions at all. Instead, the statement showed two transactions every Monday in March 2023.

3

{¶8} The March 2023 statement showed transactions on Monday, March 27 for $269.36 and $215.60. There was no transaction on the statement matching the $21.56 charge from the "Totals Report." None of the transactions in the statement were itemized by purchase.

{¶9} Henderson testified in his defense and submitted his credit card statement for the month of March 2023. His statement showed a transaction on March 26, 2023, at Jewelry Palace for a purchase of $140. The transaction had a "settlement date" of March 27, 2023. Henderson explained that the settlement date is the date the bank transferred the money to the owner. Based on his card statement, Henderson believed he had paid for the jewelry. Henderson also submitted screenshots from his phone purporting to show the notifications he received.

{¶10} Henderson returned at least once to the owner's kiosk to demand an apology. The owner told Henderson the transaction had not gone through and informed him that theft charges had been filed against him.

## B. The trial court convicted Henderson

{¶11} The trial court found Henderson guilty of theft. It relied on the state's two exhibits showing declined receipts. The trial court discounted the various financial records and stated it was not basing its decision on Henderson's or the owner's credibility. The court discredited Henderson's exhibits showing the pending charge notifications on his phone because it believed the exhibits were inconsistent and because they were not dated. It did not discuss Henderson's credit card statement. The court hinted that Henderson may have been engaged in a scam.

4

### C. Henderson's motion for new trial and restitution payment

**{¶12}** After finding Henderson guilty, the trial court stated that if Henderson paid $70 in restitution to the seller, the court would not impose probation, fees, or costs.

**{¶13}** Henderson moved for a new trial, arguing that the court erred in discounting his exhibits despite having accepted the parties' stipulation of the exhibits. He also argued that the verdict was contrary to law. The trial court denied his motion.

**{¶14}** At sentencing, Henderson stated that he would appeal the conviction and declined to pay restitution. The court imposed a suspended 180-day sentence and "150 in costs, six months probation paid through. Conditions of probation: obey all rules, treatment as recommended. $70 restitution to prosecuting witness to be paid first." Henderson asked for a stay of execution pending appeal, which the trial court granted. The trial court stated it was issuing an appellate bond of "OR, plus EMU, plus stay out of [Northgate Mall]." The judge's sheet indicated that the sentence was $150 in fines with the line for costs checked as well.

**{¶15}** In October 2023, the trial court terminated Henderson's community control in an entry stating Henderson had "paid restitution as instructed." The entry also stated that Henderson's sentence included $150 in fines, $110 in costs, and $120 in fees. The entry did not indicate that the fines, costs, and fees were remitted. That same day, Henderson filed this appeal.

## II. Law and Analysis

### A. Mootness

**{¶16}** As a threshold matter, we must determine whether Henderson's appeal is moot. Though Henderson obtained a stay from the trial court pending appeal, he

later paid restitution and the trial court terminated his community control. Henderson explains that he paid the restitution because he was unable to meet the conditions of his appellate bond.

{¶17} An appellate court lacks jurisdiction over a moot appeal. *State v. Ekouevi*, 1st Dist. Hamilton No. C-220267, 2023-Ohio-703, ¶ 4. An appeal from a misdemeanor conviction in which the defendant has fully served the sentence before the appeal is heard is moot unless the defendant can show that the sentence was served involuntarily or will result in an ongoing collateral disability. *Id*. at ¶ 4.

{¶18} This court and several other Ohio courts have held that an appeal of a misdemeanor conviction is not moot even if the defendant has served the sentence when fees, costs, or fines remain unpaid. *State v. Tsibouris*, 1st Dist. Hamilton Nos. C-120414 and C-120415, 2014-Ohio-2612, ¶ 18 (collecting cases); *see State v. Ruley*, 2d Dist. Miami No. 2017-CA-10, 2018-Ohio-3201, ¶ 10 ("[u]npaid court costs alone suffice to prevent a judgment from being moot, even if an appellant has completed his jail sentence."). The court can refer to extrinsic evidence in determining whether an appeal is moot. *Pewitt v. Superintendent, Lorain Corr. Inst.*, 64 Ohio St.3d 470, 472, 597 N.E.2d 92 (1992).

{¶19} In *Tsibouris*, this court explained that where the "record [does] not affirmatively demonstrate" that a defendant has paid costs, fines, or fees, an appeal is not moot. *Tsibouris* at ¶ 17, citing *In re Payne*, 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, ¶ 2-4. Similarly, in cases where the record is unclear as to whether costs, fines, or fees have been paid, most courts presume that costs remain unpaid and hold that the appeals are not moot. *See State v. Hoff*, 5th Dist. Fairfield No. 02 CA 89, 2003-Ohio-3858, ¶ 12 ("Neither appellant nor the State has shed further light on this issue;

6

therefore, we presume the court costs remain unpaid"); *see also Ruley* at ¶ 10 ("Nevertheless, the trial court did impose court costs, and nothing in the record suggests that Ruley has paid those costs."). Courts have also referred to the clerk of court's website to confirm that costs remain unpaid. *See State v. Nared*, 2d Dist. Clark No. 2017-CA-3, 2017-Ohio-6999, ¶ 12 ("However, the record does not indicate that the costs imposed have been paid. * * * The Clark County Municipal Court website indicates that they have not been paid."); *see also State v. Carthon*, 197 Ohio App.3d 677, 2012-Ohio-196, 968 N.E.2d 576, ¶ 3 (2d Dist.), fn. 2 ("Information obtained from the Xenia Municipal Court indicates, however, that Carthon remains on probation and that he has not paid his fines or costs.").

{¶20} The record in this case does not affirmatively demonstrate that Henderson has paid the court costs, fines, or fees imposed by the trial court. On the day of the trial, after finding Henderson guilty, the trial court suggested that if Henderson paid $70 in restitution, the court would not impose any probation, costs, fines, or fees. But on the day of sentencing, Henderson stated that he would be appealing and would not be paying the $70 in restitution. Then the trial court orally imposed its sentence, which included the $70 restitution order along with $150 in costs. The judge's sheet, however, reflects that Henderson's sentence was a $150 fine *and* costs. When Henderson later paid the $70 in restitution, the trial court terminated his community control in an entry stating that Henderson's sentence included a $150 fine, $110 in costs, and $120 in fees. The entry states that Henderson had "abided by the terms of Community Control" but only states that Henderson paid the restitution.

{¶21} The state suggests that the trial court simply waived the costs and fines after Henderson paid the restitution. But the record does not bear that out because it

does not indicate that the court remitted the costs and fines (or fees) imposed. Further, the trial court stated that it would not impose fines, costs, or fees, if Henderson paid restitution *at sentencing*. Henderson did not pay the restitution at the sentencing. Instead, he told the trial court that he intended to appeal and requested a stay. The trial court then imposed costs and its journal entry imposed a $70 restitution order "to be paid *first*."

{¶22} While a review of the clerk of court's website does not show any outstanding costs, the trial court's journal, not the clerk's website, determines Henderson's sentence. As Henderson argues, ambiguity regarding unpaid court costs can impede a defendant's attempt to expunge a conviction. The record must affirmatively demonstrate that no costs, fines, or fees can be collected from Henderson. Because it does not, we hold that Henderson's appeal is not moot.

## B. First assignment of error: Sufficiency and weight of the evidence

{¶23} Henderson's first assignment of error argues that his conviction was based on insufficient evidence and against the manifest weight of the evidence. While Henderson argues these assignments together, "[s]ufficiency and manifest weight are different legal concepts." *State v. Mack*, 8th Dist. Cuyahoga No. 109514, 2021-Ohio-1102, ¶ 17. Because we hold Henderson's conviction was not supported by sufficient evidence, we do not reach the manifest-weight challenge.

{¶24} A sufficiency-of-the-evidence challenge "tests 'the adequacy of the evidence on each element of the offense.' " *State v. Wright*, 1st Dist. Hamilton No. C-220578, 2024-Ohio-851, ¶ 25, quoting *State v. Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, ¶ 9. Viewing the evidence in the light most favorable to the state, appellate courts ascertain whether reasonable fact

finders could have determined that the state proved each element of the offense beyond a reasonable doubt. *State v. Kendrick*, 1st Dist. Hamilton No. C-220459, 2023-Ohio-1763, ¶ 15.

### 1. Theft under R.C. 2913.02(A)

{¶25} R.C. 2913.02(A)(1) provides that no person, "with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services (1) Without the consent of the owner or person authorized to give consent." Thus, to convict Henderson, the state needed to prove beyond a reasonable doubt that Henderson, (1) with purpose to deprive the store owner of property, (2) knowingly obtained or exerted control over the property, (3) without the store owner's consent. R.C. 2913.02(A)(1).

{¶26} "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). Purpose can be inferred from circumstantial evidence. *State v. Riley*, 9th Dist. Summit No. 24789, 2010-Ohio-1350, ¶ 13.

{¶27} Relevant here, "deprive" means "[w]ithhold[ing] property of another permanently * * * " or "accept[ing], us[ing], or appropriate[ing] money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration." R.C. 2913.01(C).

{¶28} To obtain a conviction for theft, the state is required to establish the "defendant's intent to deprive '*at the time*' the property was taken." (Emphasis added.) *City of Brooklyn v. Fouche*, 8th Dist. Cuyahoga No. 85510, 2006-Ohio-169, ¶ 37. And to support a theft conviction, the state must prove more than the defendant's mere failure to pay for an item. *See Riley* at ¶ 13 ("the nonpayment of a contract, standing

9

alone, will not give rise to criminal charges"); *see also State v. Metheney*, 87 Ohio App.3d 562, 567, 622 N.E.2d 730 (9th Dist.1993) ("While evidence that appellant did not pay the bills is some evidence that she intended not to pay them when she received the electricity, the state cites no authority for the proposition that nonpayment alone is sufficient to prove intent at the time of receipt.").

{¶29} Under R.C. 2913.02(A)(1), the state must prove that the owner did not consent to the defendant's obtaining control over the property. "Consent may be either express or implied. Express consent is determined by the written or spoken words of the persons involved. Implied consent is determined by the facts and circumstances that surround those involved, including their words and acts, from which [one] may infer that consent was given to the defendant." 2 *Ohio Jury Instructions*, CR Section 513.02 (2024); *accord Black's Law Dictionary* 323 (8th Ed.2004) (express consent is consent "clearly and unmistakably stated" and implied consent is consent "inferred from one's conduct"). After a person assumes control over property with the owner's consent, that person cannot later exert control for a different purpose. Instead, we look to whether the person acted within the scope of the owner's consent. *State v. Woodburn*, 2019-Ohio-2757, 140 N.E.3d 66, ¶ 24 (4th Dist.), quoting *State v. Roberts*, 2d Dist. Montgomery No. 26431, 2015-Ohio-2716, ¶ 13, quoting *State v. Dortch*, 2d Dist. Montgomery No. 17700, 1999 Ohio App. LEXIS 48384 (Oct. 15, 1999). Using property in a manner beyond that specially authorized by the owner exceeds the owner's consent, which is prohibited by R.C. 2913.02(A)(2). *Id.*, quoting *Roberts* at ¶ 13, quoting *Dortch* at 10.

### 2. The state failed to prove lack of consent

**{¶30}** The state presented insufficient evidence to convict Henderson of theft in violation of R.C. 2913.02(A)(1) because the store owner consented to Henderson's taking the jewelry. Officer Quinn instructed Henderson to leave with the jewelry and return to pay for the jewelry if he discovered that the transaction had not gone through. The store owner agreed with this plan, took Henderson's contact information, and allowed Henderson to leave with the jewelry. The store owner even testified that when he gave Henderson the jewelry, he believed that Henderson had not paid for it but was willing to give it to Henderson to "wait and see" if the payment came through. The circumstances surrounding the interaction demonstrate that no reasonable person would believe that Henderson did not have the jewelry owner's consent to leave with the jewelry. Therefore, Henderson had consent to obtain control over the jewelry at the time that he came into possession of the jewelry.

**{¶31}** At oral argument, the state asserted that the seller's consent was conditioned on Henderson ensuring that payment went through. But a violation of that consent could not constitute a violation of R.C. 2913.02(A)(1). It would, if anything, constitute a violation of R.C. 2913.02(A)(2). *See* 1974 Committee Comment to R.C. 2913.02 ("Under [R.C. 2913.02(A)(2)], the basic elements of the offense must still coincide, but conversion or embezzlement now constitutes theft, since the section defines theft as exerting control (as opposed to initially gaining control over property or services) beyond the scope of the owner's consent, and with purpose to deprive the owner of the same."). The trial court also suggested that Henderson was engaged in a scam. If that were the case, Henderson should have been charged under R.C. 2913.02(A)(3), which criminalizes theft "by deception."

**{¶32}** The state's theory of the case was that Henderson committed theft by not returning to pay for the jewelry. At trial, the state asked the seller "at the time that [Henderson] had the items the *second* and *third* time, did he have consent to have those items without paying for them?" The seller responded, "I don't think so, no." Assuming that the purchase was never completed, Henderson's failure to return and pay for the jewelry would not be a violation of R.C. 2913.02(A)(1) because Henderson had the store owner's consent to obtain control over the jewelry when he first exerted control over it. We accordingly hold that Henderson's conviction was based on insufficient evidence and sustain Henderson's first assignment of error.

**{¶33}** A conviction based on insufficient evidence violates a defendant's due-process rights and precludes the state from retrying the defendant. *See State v. Hunter*, 1st Dist. Hamilton No. C-961142, 1997 Ohio App. LEXIS 5806, 9 (Dec. 26, 1997); *see also Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). We reverse Henderson's conviction and discharge him from further prosecution.

**{¶34}** Based on our resolution of Henderson's first assignment of error, his remaining assignments of error are moot and we decline to address them.

### III.    Conclusion

**{¶35}** We sustain Henderson's first assignment of error, reverse the trial court's judgment, and discharge Henderson from further prosecution. The remaining assignments of error are moot.

Judgment reversed and appellant discharged.

**ZAYAS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.