[Cite as *State v. White*, 2024-Ohio-4654.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240093 |
| | | TRIAL NOS. C-23CRB-572A |
| Plaintiff-Appellee, | : | C-23CRB-572B |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| KANDICE WHITE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Municipal Court

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal: September 25, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *David H. Hoffmann*, Assistant Public Defender, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1} Plaintiff-appellant Kandice White appeals from the trial court's judgments convicting her of two counts of abandoning animals in violation of R.C. 959.01. In a single assignment of error, White contends that her convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Finding White's arguments to be without merit, we affirm the trial court's judgments.

## I. Factual and Procedural Background

{¶2} Complaints were filed against White in the Hamilton County Municipal Court charging her with two counts of abandoning animals in violation of R.C. 959.01 (the "A and B charges"), two counts of cruelty to animals in violation of R.C. 959.131 (the "C and D charges"), and two counts of failure to register dogs in violation of R.C. 955.21 (the "E and F charges"). Three of the charges (one for each offense) concerned White's dog King, and three charges concerned White's dog Kona.

{¶3} White entered guilty pleas to the failure-to-register charges and proceeded to a bench trial on the four remaining charges.

{¶4} Deputy dog warden Caleb Crawford testified that he carried out a welfare check on animals at an address on Gertrude Lane on December 23, 2022. Although snow was on the ground at the time of his visit, Crawford observed no footprints or pawprints in the snow on the property. Crawford noticed that a bottom window on the left side of the house was open, and he saw two dogs, one black and one brown, running loose inside the house. Crawford knocked on all doors but received no response. Because the mailbox was full, Crawford believed nobody had been to the home in quite a while.

{¶5} Crawford observed White's name on a piece of mail and attempted unsuccessfully to contact her. Following the established process for dealing with potentially abandoned animals, Crawford left notice at the home as to the purpose of his visit and placed tape on all entry points, which would allow him to determine whether any person had entered or exited the home. He also closed the open window to ensure that the dogs stayed secure. Crawford testified that he was trained in assessing an animal's condition, and that while the dogs looked slightly underweight, he did not feel that taking immediate action was necessary. He explained that on a scale of one to nine, with one constituting emaciated and nine constituting obese, he would rate both dogs a two point five. Crawford further testified that the case report on the animals indicated that a different dog warden made contact with White on December 24, 2022, the day after Crawford's visit, and determined that the dogs were being cared for and were not abandoned.

{¶6} Deputy dog warden Christopher Hudson testified that he was dispatched on January 2, 2023, to the Gertrude Lane address for an additional wellness check and possible abandonment of animals. Upon arriving at the property, Hudson noticed that the bottom window on the left side of the house was again open. He observed a brown dog running loose inside the house and a large bag of dog food on the kitchen counter. He also saw fecal matter on the floors. After walking to the back of the house, Hudson heard running water. Upon further investigation, he saw a flow of water coming from underneath the basement door. He could also hear a dog barking on the other side of that door. Hudson contacted White, who stated that she had not been to the house in four days because she was having vehicle issues. Hudson

3

determined that he needed to collect the animals because "[f]our days is well past the timeframe of an animal being cared for."

{¶7} Hudson testified that the urgency of collecting the animals was increased after he noticed that there were several inches of standing water on the basement floor. He entered the home through the open window and found that the standing water was cold and came up past his boots. Hudson observed that the brown dog had chewed through the basement door. He was able to confine that dog and unlock the front door for other officers to enter the home. Hudson located the second dog inside a crate in the basement. The room holding the dog also contained a burst pipe that was the cause of the accumulating water. The dog and a blanket were the only things inside the crate, and Hudson did not see any food left for the animals. Footage from Hudson's body-worn camera was admitted and played for the trial court.

{¶8} After the animals were secured, Hudson met with White at the location where she was staying. White told him she was not aware that a pipe had burst, and that she had not been to the house in four days due to transportation issues and because she had been caring for her grandmother. Hudson testified that, because of the amount of standing water in the home, he had reason to believe that nobody had been there for a substantial amount of time.

{¶9} White's mother Jenae Inman testified that White was bonded with the dogs and took them everywhere. However, Inman explained that after White ended a relationship in late summer to early fall of 2022, she could no longer afford the rent on the Gertrude Lane home where she had been staying with the dogs and her landlord threatened eviction. Inman stated that because White needed to find a smaller and more affordable place to live, she attempted to rehome the dogs.

4

{¶10} According to Inman, White began a new relationship with Brian Thompson in late summer of 2022, and began to shut Inman out of her life. Inman noticed that Thompson would make comments about the dogs, and she felt that White was hesitant to visit them. Inman testified that she received text messages from White asking her to feed the dogs and that, on occasion, she assisted White by doing so.

{¶11} White testified that her dogs were named King and Kona, and that she and the dogs had lived with her former boyfriend Tyler Kelly at the home on Gertrude Lane. She stated that she and Kelly broke up in May of 2022 and that she began dating Thompson a few months later. After the breakup, Kelly initially helped care for the dogs. However, White explained that Thompson wanted her to disassociate with everything in her life connected to Kelly, including the dogs. White testified that Thompson was physically violent with her, that he forced her to stay at his grandmother's house, and that he took her car to deprive her of transportation. She stated that Thompson threatened to shoot the dogs if he caught her at the Gertrude Lane home and that she felt forced to leave them for fear of her own safety.

{¶12} White testified that she left food and water in the crates on her last visit to the Gertrude Lane home, and that she was unaware a pipe had burst. She explained that Kona, the dog found in the crate by Deputy Hudson, would regularly kick the bowl outside of the crate when it was empty. White also testified that she would typically ask her mother and sister to feed the dogs, but that she did not do it herself because of her fear of Thompson.

{¶13} At the close of trial, the court found White guilty of the two abandonment charges (A and B) but acquitted her of the C and D charges for cruelty to animals. At a separate sentencing hearing, the trial court imposed a suspended

sentence of 90 days' imprisonment on the A charge. It also imposed restitution in the amount of $480 to the dog warden, imposed "zero fine," and remitted court costs. The court further placed White on a six-month period of probation, which included a prohibition on harboring, keeping, or owning any canine companion animals. On the B charge, the trial court sentenced White to "zero days in jail, zero fine, cost remit."

{¶14}   White requested a stay of sentence on both charges pending appeal. The trial court initially granted the stay, but after a subsequent sidebar, denied it. White now appeals.

## II. Appeal on B Charge is not Moot

{¶15}   Before turning to the merits of White's appeal, we must address a procedural issue that the parties have raised. The State contends that White's appeal from the trial court's judgment on the B charge is moot because the trial court did not impose a suspended sentence or community control, and it chose not to impose a fine or costs. As such, the State posits, the sentence on the B charge has been fully served.

{¶16}   White contends that the appeal from the trial court's judgment on the B charge should not be considered moot because she attempted to preserve her right to appellate review by requesting a stay. We agree.

{¶17}   This court lacks jurisdiction to consider the merits of a moot appeal. *State v. Henderson*, 2024-Ohio-2312, ¶ 17 (1st Dist.). "An appeal from a misdemeanor conviction in which the defendant has fully served the sentence before the appeal is heard is moot unless the defendant can show that the sentence was served involuntarily or will result in an ongoing collateral disability." *Id.* A defendant can establish that a sentence was not served voluntarily where the defendant requested a

6

stay of the sentence from the trial court to allow for an appeal. *State v. Farris*, 2016-Ohio-5527, ¶ 4 (1st Dist.).

{¶18} As set forth above, the trial court imposed the following sentence on the B charge: "zero days in jail, zero fine, cost remit." The trial court clearly exercised its discretion not to impose a financial sanction or community service on this charge, as it was entitled to do. *See State v. White*, 2019-Ohio-1215, ¶ 15 ("a trial court's decision to exercise its discretion not to impose a monetary or community-service sentence must be clearly communicated in the text of the entry"). Even though her sentence was, for all practical purposes, already served upon imposition, White nonetheless requested a stay of this sentence pending appeal. Although her request was denied, White took the action necessary to preserve her right to appellate review. *See Farris* at ¶ 4. To hold otherwise would penalize White for the trial court's discretionary decision to forego imposing a monetary or community-service sentence for this offense.

{¶19} We accordingly hold that White's appeal from the trial court's judgment on the B charge is not moot, and we turn to the merits of White's appeal.

### III. Sufficiency and Weight of the Evidence

{¶20} In her sole assignment of error, White argues that her convictions are based on insufficient evidence and are contrary to law. She challenges both the sufficiency and the weight of the evidence supporting her convictions, specifically contending that the evidence failed to establish that she intended to abandon her dogs.

{¶21} In reviewing the sufficiency of the evidence, we must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Cleaned up.) *State v. Walker*, 2016-Ohio-8295, ¶ 12.

**{¶22}** In contrast, when this court reviews a challenge to the manifest weight of the evidence, it must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶23}** White was convicted of abandoning animals in violation of R.C. 959.01, which provides that "[n]o owner or keeper of a dog, cat, or other domestic animal, shall abandon such animal." The term "abandon" is not defined in the statute, and what constitutes abandonment of an animal for purposes of R.C. 959.01 is an issue of first impression for this court.

**{¶24}** In reviewing convictions under R.C. 959.01 for abandoning animals, Ohio's appellate districts have applied two different definitions of "abandon." The Ninth and Fifth Appellate Districts have utilized a definition of abandon that was developed in an "unrelated civil context." *State v. Hull*, 2015-Ohio-4001, ¶ 26 (9th Dist.). These districts have held that abandonment "will not be presumed but requires affirmative proof of a person's intent to totally discard the property." *Id.*, quoting *Carver v. Szefcyk*, 1988 Ohio App. LEXIS 4289, *6 (9th Dist. Oct. 26, 1988); *accord State v. Amos*, 2014-Ohio-3097, ¶ 21 (5th Dist.). Both *Hull* and *Amos* trace this definition of abandonment back to *Kiser v. Bd. of Cty. Commrs. of Logan Cty.*, 85 Ohio St. 129 (1911). In *Kiser,* the court considered whether a property owner had abandoned a mill-dam and whether the mill-dam could be taken without paying the owner compensation. *Kiser* at 131 and 134-135. The facts of *Kiser*, and the legal context

8

in which this definition arose, are incongruous with a typical case arising under R.C. 959.01.

{¶25} In contrast, the Second District has taken a different approach, relying on *Black's Law Dictionary* to determine the meaning of "abandon" in the context of a conviction under R.C. 959.01. *See State v. Harding*, 2023-Ohio-3508, ¶ 19 (2d Dist.). The *Harding* court defined "abandon" as "to leave (someone), especially when doing so amounts to an abdication of responsibility." (Cleaned up.) *Id*, quoting *Black's Law Dictionary* (11th Ed. 2019).

{¶26} We read both definitions to require an intentional act on the part of the offender. The principal difference between these two definitions is the length of time of the intended abandonment. The definition applied in *Hull* and *Amos* requires an "intent to *totally* discard" the animal. (Emphasis added.) *Hull* at ¶ 26; *Amos* at ¶ 21. In contrast, the definition used in *Harding* does not necessarily require such a permanent intent to abandon and supports a finding of abandonment where the offender has abdicated responsibility for the animal, seemingly even if the offender intended to return and care for the animal at some future point. *See Harding* at ¶ 19.

{¶27} We will apply all relevant rules of statutory construction when determining how to define the term "abandon." Accordingly, we recognize that "'[t]he plain, ordinary, or generally accepted meaning of an undefined statutory term is invariably ascertained by resort to common dictionary definitions.'" *Hardy v. P&G Co.*, 2011-Ohio-5384, ¶ 22 (1st Dist.), quoting *Fickle v. Conversion Technologies Internatl. Inc.*, 2011-Ohio-2960, ¶ 29 (6th Dist.). Further, when construing a statute, a court's primary goal is to give effect to the intent of the legislature, which is determined by looking at the language and purpose of the statute. *State v. Miranda*,

2014-Ohio-451, ¶ 11. The indisputable purpose of the legislature in enacting R.C. 959.01 was to ensure the protection of domestic animals. The legislature attempted to do so via R.C. 959.01 by criminalizing the abandonment of an animal.

**{¶28}** Applying these principles of statutory construction, we are persuaded that utilizing the *Harding* court's definition of "abandon" taken from *Black's Law Dictionary* is the best approach. This definition, which does not require an "intent to totally discard" the animal, best furthers the purpose of the legislature in enacting the statute. To hold otherwise would allow an owner or keeper of an animal to abandon that animal for unspecified periods of time without facing criminal liability, as long as the owner or keeper intended to return and care for the animal at some future point. In such a scenario, the purpose of the legislature in enacting R.C. 959.01 is frustrated, as the animal would likely suffer harm during the period in which care is not provided. In contrast, defining "abandon" as "to leave (someone), especially when doing so amounts to an abdication of responsibility," advances the purpose of the statute and the legislature's intent, as it imposes criminal liability any time an owner or keeper of an animal intentionally abdicates responsibility for that animal. (Cleaned up.) *Harding,* 2023-Ohio-3508, at ¶ 19 (2d Dist.).

**{¶29}** Although the *Harding* court's definition of abandon does not require an "intent to totally discard" an animal, common sense must still be applied when determining whether an animal has been abandoned. Consider, for example, a situation in which an individual arranged for his or her animal to be cared for while the individual was on vacation, but travel circumstances caused a delay in the individual's return, resulting in a period when the animal lacked care. In this hypothetical scenario, the individual likely has not abdicated responsibility for or

10

abandoned that animal. The intent of the owner or keeper of the animal is crucial to determining whether an animal has been abandoned. This is a highly fact-specific inquiry.

**{¶30}** In determining whether an offender intended to abandon an animal, guidance can be found in 1 Ohio Jur.3d, Abandoned, Lost, and Unclaimed Property, § 8 (2024), which provides that intent to abandon can be established by either "unequivocal and decisive acts indicating such intention" or "express declaration," or may be "inferred from circumstances indicative of intention."

**{¶31}** Following our review of the record, we hold that the state presented sufficient evidence of White's intent to abandon, and actual abandonment of, her two dogs. By her own admission, White no longer resided at the home where she kept the dogs, and she had not been to the home to care for them in four days. Further, she lacked transportation to get to the home where the dogs were kept. White's testimony additionally established that she was in an abusive relationship and that she feared for her safety if she cared for the dogs. As a result, White sometimes asked family members to care for her dogs, but would not do it herself.

**{¶32}** Not only does the record contain "decisive acts" and a declaration from White indicating that she would not care for the dogs, but her intent to abandon can also be inferred from the circumstances in which the dogs were discovered. *See* 1 Ohio Jur.3d, Abandoned, Lost, and Unclaimed Property, § 8. The dogs were left alone for four days, according to White, and there was no evidence or testimony that anyone was caring for them during that time. They were discovered without food or water in a home containing fecal matter on the floors. One dog was discovered locked in a crate

in the basement, in a room filled with several inches of cold water caused by a burst pipe. The leaking pipe was near electrical wiring.

{¶33} White argues that the facts of the case at bar are similar to those in *Hull*, 2015-Ohio-4001 (9th Dist.), where the court found that a conviction for abandonment of animals was not supported by sufficient evidence. In *Hull*, appellant Hull kept three dogs in a rented home. The dogs had access to the home and to a fenced-in yard. *Id*. at ¶ 2. After a neighbor noticed that the dogs were emaciated and called the Humane Society, a dog warden responded and learned from Hull's landlord that Hull was in the process of being evicted. *Id*. at ¶ 11 and 13. The warden found the dogs to be emaciated and gave them water and treats. She also left notice for Hull. After receiving no response from Hull for 24 hours, the warden returned to the property, where she again noticed no food or water in the dogs' bowls. *Id*. at ¶ 14. The dogs were ultimately removed from the property and Hull was charged with, and convicted of, abandoning animals. On appeal, Hull argued that the evidence was insufficient to establish that he had abandoned the animals. The Ninth District agreed. It held that:

> After reviewing all of the evidence in a light most favorable to the State, we cannot conclude there is sufficient evidence constituting "affirmative proof" that on or about August 27, 2013, Mr. Hull intended "to totally discard the [dogs]." *Carver [v. Szefcyk]*, 1988 Ohio App. LEXIS 4289, 1988 WL 114455, at *2 [9th Dist. Oct. 26, 1988]. While the dogs were not being cared for, they were still being kept in an enclosed space on property rented by Mr. Hull. Moreover, on or about August 27, 2013, Mr. Hull was not yet evicted from that property and there was evidence that someone was returning to the property during the relevant time

frame. Thus, we cannot say that a reasonable trier of fact could conclude from the evidence that Mr. Hull abandoned the dogs on or about August 27, 2013.

*Id.* at ¶ 30.

**{¶34}** While *Hull* does share some similarity to the case before us, it also contains notable differences. Our record establishes that, out of fear for her own safety, White did not intend to visit or personally provide care for her dogs. Further, White's dogs lacked care for a four-day period at the time that they were removed from White's home, and one dog was found locked in a crate in inches of cold water. In contrast, the record in *Hull* contained evidence that someone was returning to Hull's property during the relevant time frame. And it does not contain evidence that Hull, whether out of fear or any other personal motivation, did not intend to care for the animals going forward. Nor were Hull's animals found in the same hazardous environment from which White's dogs were recovered. It also bears noting that the *Hull* court applied a definition of abandon requiring an intent to totally discard the animals, which this court has rejected.

**{¶35}** We accordingly hold that, viewing the evidence in the case before us in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that White abdicated her responsibility to her dogs and abandoned them. *See Walker*, 2016-Ohio-8295, at ¶ 12; *Harding*, 2023-Ohio-3508, at ¶ 19 (2d Dist.).

**{¶36}** Nor were White's convictions against the manifest weight of the evidence. As the trier of fact, the trial court was in the best position to judge the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one

of the syllabus; *State v. Shepard*, 2021-Ohio-964, ¶ 62 (1st Dist.). It was entitled to reject portions of White's testimony as either self-serving or as not credible. Although White testified that she asked her family members to help care for the dogs, the record established that the dogs were left without care for lengthy periods of time on more than one occasion. Nor did the conditions in which the animals were found support a determination that White ensured that others cared for the dogs. The trial court did not lose its way and commit a manifest miscarriage of justice in convicting White. *See Powell*, 2020-Ohio-4283, at ¶ 16 (1st Dist.).

{¶37}   White's assignment of error is overruled, and the trial court's judgments convicting her of abandoning animals are affirmed.

Judgments affirmed.

**BOCK, P.J.,** and **WINKLER, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.